No. 22-55305

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT


DOLORES CALDERON,

*Plaintiff-Appellant,*

v.

BIO-MEDICAL APPLICATIONS OF
MISSION HILLS, INC., et al.,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
No. 2:20-cv-07869-PSG-JEM
Hon. Phillip S. Gutierrez

---

**APPELLANT'S OPENING BRIEF**

---

Joseph S. Socher SBN: 241344
JOSEPH S. SOCHER, ESQ., APC
3580 Wilshire Blvd., Suite 1260
Los Angeles, CA 90010
Telephone: (213) 205-6444
Facsimile: (213) 337-8731
jss@socherlaw.com

*Attorneys for Appellant,*
*DOLORES CALDERON*

# TABLE OF CONTENTS

TABLE OF CONTENTS ...............................................................ii

TABLE OF AUTHORITIES ........................................................v

INTRODUCTION.......................................................................1

JURISDICTIONAL STATEMENT ............................................2

STATUTORY AUTHORITIES..................................................2

ISSUES PRESENTED ...............................................................3

STATEMENT OF THE CASE ...................................................4

    I.      FACTUAL BACKGROUND.......................................4

         A.     Plaintiff's job duties. ......................................4

         B.     Plaintiff's injury and restrictions. ................5

         C.     Plaintiff requests assistance from new manager Akram. .................................................................6

         D.     Defendant takes no action to clarify restrictions or engage in an interactive process with Plaintiff or her doctors. ...............................................................7

         E.     Clinic undergoes changes but Plaintiff's duties remain the same. ................................................9

         F.     Hayden visits clinic and immediately begins termination process.............................................9

         G.     Hayden declares intent to get rid of disabled employees. .........................................................11

         H.     Defendant fails to follow policy or take reasonable steps to determine if Plaintiff could be accommodated. ................................................11

I.    Plaintiff's performance review and termination. ........ 14

J.    Defendant's offer of leave of absence or permanent disability option was not serious. ............................... 17

K.    Defendant fails to make any effort at accommodation after issuing Plaintiff's 3-option ultimatum. ............... 18

L.    Mitigation status was not the reason for Plaintiff's termination .................................................................. 19

II.    PROCEDURAL HISTORY ................................................ 20

A.    Plaintiff alleges disability claims against Defendants. ................................................................... 20

B.    District court grants Defendants' motion for summary judgment ........................................................ 21

C.    Plaintiff timely files notice of appeal. ........................... 23

SUMMARY OF THE ARGUMENT ........................................... 23

ARGUMENT ................................................................................. 24

I.    STANDARD OF REVIEW ................................................ 24

II.    SUMMARY JUDGMENT AS TO CLAIMS FOR DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE MUST BE REVERSED ......................... 26

A.    Plaintiff was able to perform the essential functions of her job with reasonable accommodation. ................... 30

1.    Plaintiff performed her job for years under the same restrictions and received a performance review days before her employment ended. ....... 31

2.    Multiple facts indicate that Plaintiff could have continued to perform her job with reasonable accommodation .................................................. 32

3. Plaintiff had successfully performed her job with reasonable accommodation and could have continued to do so................................................. 33

B. The facts indicate that Defendant was imposing a 100% healed policy, which a violation of the law. ........ 38

C. Defendant had a duty to offer an alternative job as a reasonable accommodation. ......................................... 39

D. Defendant's "offer" of a leave of absence or permanent disability was not a reasonable accommodation. ........ 43

E. Defendants failed to follow their own disability accommodation policies................................................ 44

III. FAILURE TO ENGAGE IN GOOD FAITH INTERACTIVE PROCESS .............................................................................. 45

IV. RETALIATION FOR REQUESTING ACCOMMODATION 49

V. WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY .............................................................................. 51

CONCLUSION ....................................................................................... 52

CERTIFICATE OF COMPLIANCE....................................................... 53

CERTIFICATE OF SERVICE................................................................ 54

ADDENDUM ......................................................................................... 55

# TABLE OF AUTHORITIES

**Cases:**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)....................................25

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).............................25

*Anderson v. Valspar Corp.,* (Case No. 2:10-cv-03182-GEB-EFB) 2013
    U.S. Dist. LEXIS 18974, at *41 (E.D. Cal. Feb. 12, 2013) ............51

*Arteaga v. Brink's, Inc.*, 163 Cal. App. 4th 327 (2008) ...........................49

*Bates v. U.P.S.,* 511 F.3d 974(9th Cir. 2007) ..........................................28

*Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130 (7th Cir. 1996)46

*Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108 (8th Cir. 1995) ..........28

*Bodett v. Coxcom, Inc.* 366 F.3d 736 (9th Cir. 2004) ........................2, 24

*Brundage v. Hahn*, 57 Cal.App.4th 228 (1997) ......................................27

*Claudio v. Regents of University of California* 134 Cal.App.4th 224
    (2005) ..............................................................................................46

*Cooper v. Dignity Health,* 438 F. Supp. 3d 1002 (D. Ariz. 2020)............28

*D'Angelo v. ConAgra Foods, Inc.* 422 F.3d 1220 (11th Cir. 2005)..........35

*EEOC v. Wal-Mart,* 477 F.3d 561 (8th Cir. 2007) ..................................28

*Gelfo v. Lockhead Martin Corp.*, 140 Cal.App.4th 34 (2006) ...........39, 46

*Green v. State*, 42 Cal.4th 254 (2007) ....................................................27

*Hanson v. Lucky Stores, Inc.*, 74 Cal.App.4th 215 (1999) ......................52

*Hawkins v. City of L.A.*, 40 Cal. App. 5th 384 (2019).............................49

*Hill v. City of Phx.,* 162 F. Supp. 3d 918 (D. Ariz. 2016).......................28

*Jensen v. Wells Fargo Bank*, 85 Cal.App.4th 245 (2000)............31, 41, 42

*Johnson v. United Cerebral Palsy/Spastic Children's Found. of L.A. &*
    *Ventura Cntys.*, 173 Cal. App. 4th 740 (2009) ...............................52

*McGinest v. GTE Serv. Corp.,* 360 F.3d 1103 (9th Cir. 2004)...........26, 50

*McGregor v. National R.R. Passenger Corp.*, 187 F.3d 1113 (9th Cir. 1999) ........................................................................... 39

*Metoyer v. Chassman,* 504 F.3d 919 (9th Cir. 2007) .............................. 51

*Nadaf-Rahrov v. Neiman Marcus Group, Inc.,* Cal.App.4th 952 (2008) 30

*Nealy v. City of Santa Monica*, 234 Cal.App.4th 359 (2015) ...... 23, 29, 30

*Nicholson v. Hyannis Air Serv.* 580 F.3d 1116 (9th Cir. 2009) ........ 26, 50

*Prue v. Brady Co./San Diego, Inc.*, 242 Cal.App.4th 1367 (2015) ......... 27

*Rowe v. City and County of San Francisco*, 186 F.Supp.2d 1047 (N.D. Cal. 2002) ........................................................................ 46

*Samper v. Providence St. Vincent Med. Ctr.,* 675 F.3d 1233 (9th Cir. 2012) ......................................................................... 28

*Sargent v. Litton Systems, Inc.*, 841 F.Supp. 956 (N.D. Cal 1994) ......... 34

*Scotch v. Art Institute of California-Orange County, Inc.*, 173 Cal.App.4th 986 (2009) ................................................................ 47

*Smith v. WM Corporate Servs.* 2021 U.S.Dist.LEXIS 108236 (D.Ariz. June 8, 2021, No. CV-19-01579-PHX-SPL) ................................... 28

*Spitzer v. The Good Guys, Inc.*, 80 Cal.App.4th 1376 (2000) ..... 34, 41, 42

*Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061 (9th Cir. 2003) ...... 25

*Swanson v. Morongo Unified School District*, 232 Cal.App.4th 954 (2014) ......................................................................... 40

*U.S. v. Lot 4, Block 5 of Eaton Acres*, 904 F.2d 487 (9th Cir. 1990) ....... 26

*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054 (9th Cir. 2002) 24, 25

**Statutes:**

28 U.S.C. § 1291 ............................................................................... 2

28 U.S.C. § 1332 ............................................................................... 2

28 U.S.C. § 1441(b) ........................................................................... 2

42 U.S.C. § 12111 ............................................................................ 30

Cal. Gov't Code § 12926(f) .............................................................. 29

Cal. Gov't Code § 12926(f)(1)....................................................................29

Cal. Gov't Code § 12926(p)(2)..................................................................30

Cal. Gov't Code § 12940...........................................................24, 29, 49

Cal. Gov't Code § 12940(h) ...........................................................24, 49

**Rules:**

Fed. R. Civ. P. 56 ........................................................................................2

Fed. R. Civ. P. 56(a)................................................................................25

**Regulations:**

29 C.F.R. § 1630.2 ...................................................................................30

2 Cal. Code Regs. § 11065(e)(3)...........................................................29

2 Cal. Code Regs. § 11068 ....................................................................34

# INTRODUCTION

This is a disability discrimination case. Plaintiff/Appellant Dolores Calderon was a long-term employee at one of Defendants/Appellees' kidney dialysis clinics. She worked as a patient care technician. As the title implies, she cared for patients as they received kidney dialysis treatment.

Following a work-related injury in 2015, she became partially disabled but was still able to do her job with some accommodations and, in fact, continued to work in her job for several more years until 2020. However, in 2020, due to business reasons, the clinic was placed in "mitigation" and fell under the management of Robert Hayden. On his first visit to the clinic Hayden learned that two patient care technicians were working under disability-related work restrictions. Immediately after learning this fact, and without any further investigation, Hayden declared that "My hope is we can make the case that the business can no longer support these accommodations…" His mind was made up, he just needed someone to "make the case" to support the decision to get rid of the disabled employees.

About a month later, and without any real discussion or deliberation, Plaintiff was told that her disability could no longer be accommodated and her employment was ended. The other disabled employee was also gone by April 2020.

In sum, this was a clear case of disability discrimination and this lawsuit followed. However, despite the facts described above and the extensive factual record described below, the district court granted summary judgment on all of the Plaintiff's claims. The summary judgment should be reversed.

## JURISDICTIONAL STATEMENT

This case came to the district court via removal jurisdiction based on the diversity of the parties. (Dckt. #1.) Defendants, claiming diversity of citizenship removed the case to the district court based on 28 U.S.C. §§ 1332 and 1441(b).

This Court has jurisdiction over the appeal. The judgment is a final judgment following a grant of Defendant's motion for summary judgment under Fed. R. Civ. P. 56. This Court has appellate jurisdiction under 28 U.S.C. § 1291. *See also*, *Bodett v. Coxcom, Inc.* 366 F.3d 736, 742 (9th Cir. 2004) ("Summary judgment [is a] a final order over which we take jurisdiction pursuant to 28 U.S.C. § 1291.")

## STATUTORY AUTHORITIES

The text of relevant portions of the California Fair Employment and Housing Act ("FEHA") is included in the Addendum.

# ISSUES PRESENTED

1. The district court granted summary judgment on Plaintiff's claims for disability discrimination and failure to reasonably accommodate a disability on the grounds that Plaintiff was unable to perform the essential functions of her job with or without accommodation. Were there triable issues of fact as to whether the Plaintiff could perform the essential functions of her job with or without reasonable accommodation?

2. Did Defendant fail to reasonably accommodate Plaintiff's disability either by (a) allowing to work in her position as a patient care technician with necessary accommodation; or (b) by finding an offering her an alternative position in which she could work?

3. Did Defendant fail to engage in a good faith interactive process to find a reasonable accommodation for Plaintiff's disability?

4. Did Defendant retaliate against Plaintiff by terminating her employment due to her request for disability accommodation?

5. Did Defendant terminate Plaintiff's employment in violation of public policy based on the above violations of California's Fair Employment and Housing Act?

## STATEMENT OF THE CASE

### I.    FACTUAL BACKGROUND

### A.    Plaintiff's job duties.

Plaintiff Dolores Calderon ("Plaintiff") began working for Defendants as a patient care technician ("PCT") in a kidney dialysis clinic in 2007. She worked at a facility in Mission Hills. A PCT cares for patients by monitoring the patients, setting up the machines, and initiating and terminating the treatments.  The PCT's are also expected to stock and clean the clinic, set up the water room, keep water logs, draw labs, and provide patient education. 3-ER-368-9, 500. Depending on the assignment, a PCT may lift supplies or mixtures but generally don't lift other items. The percentage of time a PCT is engaged in lifting is "very minor."   3-ER-519.

> The job description also states:
> The position provides direct patient care that regularly involves heavy lifting and moving of patients, and assisting with ambulation. Equipment aids and/or coworkers may provide assistance. This position requires frequent prolonged periods of standing and the employee must be able to bend over. The employee may. occasionally be required to move, with assistance, machines and equipment of up to 200 lbs., and may lift chemical and water solutions of up to 30 lbs. up as high as 5 feet, There is a two-person assist program and "material assist" devices for the heavier items.
> 3-ER-369.

4

There are typically five to six PTC's on shift at the clinic when the clinic is full. 3-ER-359. The PTC's are supposed to work collaboratively and assist each other, particularly with the more physical items such as rare instance of heavy lifting. As noted, the job description specifically states PTC's should assist other staff if needed. 3-ER-359.

## B. Plaintiff's injury and restrictions.

In March 2014, Plaintiff suffered a back injury at work and worker's compensation claim was filed. When that claim was settled, it was agreed that Plaintiff would return to work on modified duty with no heavy lifting. This agreement was based on the findings of the Agreed Medical Examiner ("AME"). 3-ER-360.

The AME later made a supplemental report clarifying that Plaintiff should not lift more than 20-25 pounds and should not be required to perform repetitive bending or stooping as part of her regular job duties. On April 24, 2015, Calderon's worker's compensation doctor issued a "work status" doctor's note setting forth my restrictions to include "no heavy lifting, no repetitive bending, pulling, stooping, standing, twisting, no prolonged walking." 3-ER-360, 373-74.

Plaintiff's work restrictions were periodically updated but remained essentially the same from 2015 until she was terminated in 2020. The restrictions during the last few years leading up to her termination (i.e., from at least 2018 to 2020) stated, per her worker's

5

compensation treating physician progress reports (PR-2): "No lifting/carrying 10 pounds, no prolonged standing/walking, no bending, stooping, climbing, no kneeling, squatting or crawling." 3-ER-375-78.

Plaintiff provided the doctor's notes to Defendants, but they ignored the notes and took no discernible action to accommodate Plaintiff's disability. Upon her return to work in 2015, Plaintiff was offered and accepted modified job duties, including no heavy lifting. 4-ER-615-17, 823. However, Plaintiff testified that her job duties were not actually modified as a practical matter. 3-ER-555. Although she was never specifically instructed to perform job duties that violated her work restrictions, there were times when help was unavailable and she felt patient needs made it impossible to wait. 3-ER-493-95, 557-59. When needed, Plaintiff would sometimes request help from her coworkers to carry out her duties, but sometimes would do tasks on her own, despite the fact that they were outside of her restrictions. *Id.*

### C. Plaintiff requests assistance from new manager Akram.

By September 2019, a new manager had been appointed at the clinic, Marwish Akram. Plaintiff went to Akram to specifically request accommodation of her work restrictions. 3-ER-489. Akram had been unaware of the issue and Plaintiff provided him with a copy of the restrictions. 3-ER-490. Akram informed human resources of Plaintiff's restrictions and she was told that risk management had told human

6

resources that the workers compensation case had been settled in 2015 and that it was okay to try to accommodate Plaintiff. 3-ER-491-92. After receiving the work restrictions, Akram told Plaintiff to keep working with the restrictions. 3-ER-515.

Akram emailed human resources and stated, "no change in work assignment or accommodations at this time." 3-ER-513. In other words, Akram knew at the time Plaintiff could all of the job duties listed in her job description without assistance and both Akram and human resources agreed that Plaintiff could continue working with the same restrictions that had been in place up to that time. The email also acknowledges that the restrictions had been the same for an extended time.

**D.    Defendant takes no action to clarify restrictions or engage in an interactive process with Plaintiff or her doctors.**

While Defendant has argued that the work restrictions had gotten more restrictive with the last doctor's note, the facts show this is not true. Akram never reviewed Plaintiff's prior doctor's notes and also never asked Plaintiff's doctors for input or clarification regarding the restrictions. 3-ER-524, 529-30. The work restrictions had in fact been essentially the same for years and the 10-pound lifting limit had been the same since at least 2018. See, 3-ER-371-78. Further, as noted

7

above, Akram acknowledged that there was "no change" in Plaintiff's job assignment or restrictions.

Moreover, there was no interactive process in the time leading up to Plaintiff's termination. The only manager interacting with Plaintiff at the time was Akram. Akram, however, could not even state what the interactive process is. 3-ER-481. Akram could not state whether *any* employees of Defendant had ever sent Plaintiff's doctors reasonable accommodation forms to be completed. 3-ER-529. Akram is also unaware of whether any reasonable accommodation forms were filled out internally. *Id.*

Akram also never meaningfully engaged with Plaintiff regarding her restrictions. She never asked Plaintiff what job duties she was physically capable of doing. 3-ER-539-30. Plaintiff explained to Akram numerous times that she can do the job, that she only needed help when she gets tired, and that people did not help her when it was busy. 3-ER-493-95. When Plaintiff repeatedly brought up her restrictions, she was told the same thing by Akram: get help from coworkers. *Id.*

When Akram asked Plaintiff why she was performing duties outside of her restrictions, Plaintiff responded that others were not helping her. 3-ER-493-95. Akram Depo. Ultimately, Akram blamed her "for not utilizing help" that just wasn't there. 3-ER-495.

### E.   Clinic undergoes changes but Plaintiff's duties remain the same.

In February 2020, the Mission Hills clinic had "operational changes," going into what is called "mitigation" and Robert Hayden came on to take over the clinic.  However, the actual the operational *needs* of the clinic did not change. 3-ER-458.  The operational changes did not result in a changing of job duties for PCT's like Plaintiff nor did the operational changes change the way patients were treated. 3-ER-499. The patients' experience at the clinic would be exactly the same as it was before. *Id.*

Although Akram claimed that the operational changes eliminated the "special jobs" Plaintiff, the reality is that she had never been given any "special job," because she continued to have the basic duties of a PCT, monitoring and assisting patients and working with the other PCT's, in the same way she had for years.  3-ER-499-500. Moreover, there was never a formal written offer for any "special job" as required by Defendant's policy. 3-ER-500.

### F.   Hayden visits clinic and immediately begins termination process.

Hayden first visited the clinic on February 16, 2020. During that visit, he learned that Plaintiff and a co-worker, Celia Enriquez, had work restrictions and immediately began the process that led to Plaintiff's termination. 3-ER-441-43. Hayden first spoke to Akram

9

about Plaintiff's restrictions on the same day he started his oversight of the facility. 3-ER-443. Akram did *not* tell Hayden the clinic could not accommodate Plaintiff. 3-ER-446-47. Hayden's understanding was that Plaintiff had had restrictions for over four years and that she had been accommodated for the previous four or five years. 3-ER-444-45.

Hayden claims to have met Plaintiff twice but never observed her or any other staff actually working at the clinic. 3-ER-438-40. When Hayden visited the clinic, Plaintiff approached him and told him that she had work restrictions. 3-ER-440-41. Hayden cut her off before she could get to the specifics and told her that Defendant would take care of her. *Id.*; 3-ER-362.

Hayden testified that he and Akram discussed concerns that Plaintiff was not following her work restrictions and that her new restrictions were hindering the clinic's operational needs because she was unable to perform her primary work responsibilities without help from her coworkers, who had their own patients to care for. 3-ER-443-45, 4-ER-757. Specifically, Akram informed Hayden that Plaintiff was unable to transfer patients, clean stations, or manage the supply room based on her restrictions. 4-ER-757-59. Plaintiff's restrictions also prohibited her from carrying certain chemical contained in 5-gallon jugs needed for some patients. 4-ER-764.

Akram testified that she and Hayden also discussed the increased number of patients at the Mission Hills clinic and the clinic's need for

10

patient care technicians to perform the full range of duties to meet patient needs. 3-ER-508. Hayden told Akram that they would have to review Plaintiff's restrictions with human resources. 3-ER-447.

### G. Hayden declares intent to get rid of disabled employees.

After Hayden learned of Plaintiff's work restrictions on his first visit to the clinic, he sent an email to human resources stating: "My hope is we can make the case that the business can no longer support these accommodations…" 3-ER-461, 534. Despite Hayden's immediate decision that the accommodations should not be supported, he never requested any clarifications from a physician. 3-ER-463. This declaration was made without any investigation or knowledge of the actual facts on the grant and without any specific knowledge or observations Plaintiff's actual performance of her job.

### H. Defendant fails to follow policy or take reasonable steps to determine if Plaintiff could be accommodated.

Hayden spoke to three individuals regarding Plaintiff's disability accommodation: Akram, Rena Battles-Singleton[1] and Lillibridge.

---

[1] Now, Rena Lyons. However, she is referred to herein as Battles-Singleton to conform to the deposition testimony and documents and to avoid confusion.

Lillibridge managed leave cases and it was not relevant to have her in the discussions, but Hayden wanted her there. 3-ER-448-50.

Akram's understanding of Defendant's reasonable accommodation process is that an employee must go through the leave management office to request reasonable accommodations. 3-ER-477. Defendant's leave management is handled by a third-party vendor, Sedgwick. 3-ER-478. According to Akram, it is up to Sedgwick to determine if an employee can be accommodated or not. *Id.*

Sedgwick is supposed to be an objective third party that receives work restrictions, reviews the case, collaborate with operations to determine if the employee can be accommodated. 3-ER-465-67, 478. Sedgwick, however, was never brought in to evaluate the situation or Plaintiff's status because a claim was never opened up with Sedgwick. 3-ER-448, 467, 469. Clinical managers, such as Akram, can open a leave case on an employee's behalf but no one opened a leave management case for Plaintiff. 3-ER-466-67.

Thus, Akram never made the leave management company aware Plaintiff needed accommodations despite her understanding leave management handled the reasonable accommodation process. 3-ER-514. Akram claims that she he suggested to Plaintiff "at least a couple times" that she contact Sedgwick about her accommodations and provided Plaintiff with the telephone number. 3-ER-506, 511.

Battles-Singleton also failed to carry out basic steps to evaluate Plaintiff's status. Battles-Singleton is a senior employee relations manager for Defendant. Battles-Singleton's job duties are to help managers review policies and procedures, and help managers handle employee relations. 3-ER-385. Battles-Singleton does not generally contact employees directly. *Id.* Battles-Singleton's job is to review all accommodations that can be reasonably accommodated by any of Defendant's clinics. 3-ER-392-93. Defendant's policy is that an employee should be accommodated at practically any clinic of theirs rather than only at the clinic they work at. 3-ER-394. The sole effort Battles-Singleton made to determine if Plaintiff could be accommodated at another clinic was to talk to the manager of the Van Nuys clinic and determine if there were open positions. 3-ER-396-97. While Battles-Singleton believes others may have reached out, she does not recall any emails to the regional clinics to see if Plaintiff could be accommodated. 3-ER-397-98.

Akram and Battles-Singleton allegedly reached out to managers of other nearby clinics to see if any had open positions available that could accommodate Plaintiff's restrictions. 3-ER-395-97; 4-ER-705. However, despite these minimal efforts, Hayden asserted that none were available. 4-ER-768.

Under the normal reasonable accommodation process, an employee would receive a questionnaire along with their job description

that is given to the doctor to fill out. 3-ER-406. The questionnaire is then reviewed by the operations team and the accommodation result is provided to the employee in a memo or letter. 3-ER-406-07. Neither Battles-Singleton nor anyone else gave Plaintiff a questionnaire and job description to have her doctor fill out. 3-ER-408. A "job offer" is a document that formally offers a reasonable accommodation to an employee. 3-ER-408. Battles-Singleton is unaware if Plaintiff received a "job offer" after her restrictions were brought up in September 17, 2019. 3-ER-409-10.

Battles-Singleton did not review Plaintiff's restrictions with her, Battles-Singleton did not explore options and solutions with Plaintiff, and did not communicate any resolution or convey any undue hardship to her. 3-ER-389-90. Battles-Singleton contends there were several calls relating to accommodating Plaintiff, but Plaintiff was *never present* at any of those calls. 3-ER-401-02. Battles-Singleton also never provided Plaintiff with a list of job openings, despite admitting that she could be qualified for several categories of jobs within the company. 3-ER-422-23.

## I. Plaintiff's performance review and termination.

On or about March 9, 2020, Akram gave Plaintiff her annual performance review, the meeting lasted 30 to 40 minutes. 3-ER-520-22. In the review, Akram said she appreciated Plaintiff's ability and

willingness to take on additional responsibilities to meet the goal of improving quality care at the facility. 3-ER-523. Akram did not discuss reasonable accommodations at during the performance review or mention that she believed Plaintiff was unable to do her job. 3-ER-524.

On March 16, 2020, Lillibridge informed Akram that the workers comp case from 2015 was settled and that there was "no further indemnity exposure on the claim." 3-ER-516. Akram took this to mean there was no longer any liability exposure in relation to Plaintiff's claim. 3-ER-517.

Later that same day, on March 16, 2020, Defendant terminated Plaintiff's employment. Akram had a face-to-face meeting with Calderon and told her she would no longer be accommodated. 3-ER-456, 503-04, 509. Calderon repeatedly questioned, "why?" and said "I don't understand why I can't be accommodated." 3-ER-457, 503-04, 509. Akram responded by explaining that they "needed more PCT's that can perform their full job duties." 3-ER-509.

This was first time Defendant had ever decided that Plaintiff could not be accommodated. 3-ER-497-98. The decision was supposedly a collaboration between Battles-Singleton in human resources, Hayden and Akram, but Hayden's stated "hope" demonstrates he was the true driving force. *Id.* Hayden and Akram had decided that they wanted the

15

PCT's to be performing "full duties," rather than be subject disability restrictions. 3-ER-508.

Calderon requested that Defendant provide a statement of Defendant's decision in writing, and it was provided a few days later. The letter had three options: (1) Plaintiff had was to find work herself in another clinic; (2) apply for a leave of absence; or (3) apply for permanent disability. 3-ER-399.

Plaintiff kept working her shifts that day and after. 3-ER-510-11. A couple of days later, Calderon asked for the March 16, 2020 discussion to be memorialized in writing, as noted above. *Id*. Before Plaintiff even had a chance to review the termination letter, Lillibridge informed an outside disability service that Calderon was going to be off work as of March 20, 2020, demonstrating that the true intent of the letter was termination, not a good faith attempt at accommodation. 3-ER-413.

Other actions confirmed that Defendant considered Plaintiff's employment to have been terminated. On March 30, 2020, Akram confirmed the termination and informed EDD that the separation was not Covid related. 3-ER-528. Akram also confirmed Plaintiff's last day of work was March 20, 2020. *Id*. Those actions are only consistent with a separation of employment, not a leave of absence or placement on an "active roster."

**J.    Defendant's offer of leave of absence or permanent disability option was not serious.**

Akram had never previously discussed a leave of absence with Plaintiff prior to March 2020. 3-ER-505. At no point did Akram tell Plaintiff she could potentially use FMLA/CFRA leave as an accommodation. *Id.* In fact, Defendant never made any determination Plaintiff was even eligible for FMLA leave even though that could have been a reasonable accommodation. 3-ER-402. The management team never reached out to Sedgwick to determine if Plaintiff was eligible for FMLA leave. 3-ER-403-04. Akram never even told Plaintiff to refer to the employee handbook regarding a potential leave or the accommodation process. 3-ER-506.

Battles-Singleton was unaware of the entity that would be responsible for making disability payments nor does she know what it means to apply for permanent disability. 3-ER-399. When it became apparent Plaintiff would not be accommodated at Mission Hills, no one told Plaintiff to reach out to Sedgwick; rather she was simply told to apply for a leave of absence with no direction of how to do so. 3-ER-403-04. The management team did not think it was their job to provide her with FMLA paperwork and they did not do so. 3-ER-404.

Thus, although Plaintiff was "offered" the option of a disability leave, or permanent disability, Defendant made no effort to make that an actual option for her.  Obviously, this was not a serious offer.

17

### K.    Defendant fails to make any effort at accommodation after issuing Plaintiff's 3-option ultimatum.

Once Plaintiff received the options in writing, Defendant deemed it *her* responsibility to discover if there were open positions at other clinics.. An employee gets a "notice of offer of modified or alternative work" after the reasonable accommodation process is completed. 3-ER-415. Plaintiff did not receive such a notice at the time of her termination. In fact, she never got one of those forms after September 2019. 3-ER-416-17.

Under Defendant's policy, if an employee such as Plaintiff needed to transfer to another position because the employee could not be accommodated at their current position, the employee would have to apply for the position and it's the "same hiring process as anybody else." 3-ER-471, 479-80. Defendant does not provide a list of open jobs to the employee. 3-ER-479. No one told even Plaintiff what she needed to do reach out to other clinics. 3-ER-405. The onus is on the employee to find another position that can accommodate the work restrictions of the employee. 3-ER-479-80.  As described below, this policy is contrary to California law, which requires that an employer treat disabled employees seeking reassignment more favorable treatment than others applying for the same job and to take affirmative steps to provide a reasonable reassignment.

18

Thus, Plaintiff would not have had any preference getting another position at a clinic, she would have had to apply like anyone else. 3-ER-422-23. She was not provided with a list of different job descriptions. 3-ER-423. Plaintiff could have worked as a screener, ward clerk, and receptionist despite her restrictions. 3-ER-424. Plaintiff also could have performed the administrative assistant role. 3-ER-488. Defendant failed to offer any such positions to Plaintiff. 3-ER-362.

Plaintiff did eventually receive a letter in mid 2021 offering positions at specific clinics. However, this occurred after about a year after litigation had been filed and mostly included clinics in far-off locations such as San Diego, Fresno and Newport Beach. 3-ER-364.

## L. Mitigation status was not the reason for Plaintiff's termination.

Defendant's motion discussed the so-called mitigation status of the clinic implying that it was a reason for the termination. The witnesses, however, confirm that this was not the reason for its decision. 3-ER-418-21. Hayden did not discuss mitigation as one of the reasons why Calderon could not be accommodated anymore. 3-ER-421.

Defendants' employees gave conflicting explanations as to the alleged inability to accommodate Plaintiff. Akram testified that this was partly because of the Mission Hills clinic's increased patient load and the need for more patient care technicians who could perform their full job duties. Akram Depo. 3-ER-509. Battles-Singleton testified that

19

due in part to staffing shortages related to the COVID-19 pandemic, the Mission Hills clinic was no longer able to have other patient care technicians assist Plaintiff with her job duties. 4-ER-725-27.

Yet, Hayden testified that neither the COVID-19 pandemic nor the Mission Hill clinic's finances had anything to do with whether Plaintiff could be accommodated. Hayden Depo. 3-ER-460-61, 472.

As described below, Plaintiff subsequently filed suit for disability discrimination, failure to accommodate and related claims.

## II. PROCEDURAL HISTORY

### A. Plaintiff alleges disability claims against Defendants.

This case was initially filed in the Los Angeles Superior Court on July 22, 2020. (Dkt #1-1.) On August 26, 2020, prior to Defendants' appearance, Plaintiff filed a First Amended Complaint. (Dckt #1-2.)  On August 27, Defendants removed the matter to the district court based on diversity jurisdiction.  A Second Amended Complaint was filed on December 4, 2020, (Dkt #42.)

The named defendants in the matter initially included a number of affiliated entities; however, by the time of summary judgment only Defendants Bio-Medical Applications of Mission Hills, Inc., and Fresenius Management Services, Inc., remained. See, 1-ER- 6. Defendant Fresenius denied having employed Plaintiff, but that issue

20

was not reached by the district court, which "assume[d] for purposes of th[e] motion that Plaintiff was employed by both Defendants." *Id.*[2]

The following causes of action in the SAC were pending at summary judgment:

1. Disability Discrimination;

2. Failure to Accommodate;

3. Failure to Engage in Good Faith Interactive Process;

4. Retaliation for Requesting Accommodation; and

5. Wrongful Termination in Violation of Public Policy.

1-ER-12-13.

An additional cause of action was dismissed prior to summary judgment. (Dkt #60, 61.)

## B. District court grants Defendants' motion for summary judgment

Defendants filed their motion for summary judgment as to all of the pending causes of action on December 8, 2021. 4-ER-565-843. Plaintiff's Opposition was filed on January 29, 2022; Defendants filed their Reply on February 4, 2022. 2-ER-38-265, 2-ER-266-292, 3-ER-295-561.

---

[2] As the issue was never reached by the district court, the employer is referred to herein simply as 'Defendant.'

The district court decided the motion without hearing oral argument on February 15, 2022. 1-ER-6-30.  The district court granted the motion in its entirety finding that there was not sufficient evidence for a finder of fact to conclude that Plaintiff could perform her essential job duties with or without accommodation and that she therefore was not a "qualified individual," for purposes of a disability discrimination claim.  Similarly, the district court concluded that the failure to accommodate claim failed because she could not "not present any reasonable accommodations that would have enabled her to perform the job's essential functions." 1-ER-21.

The district court then extended this same conclusion to the claim for failure to engage in an interactive process: "Plaintiff's failure to identify an available reasonable accommodation by this stage in the litigation means that her claim for failure to engage in the interactive process cannot survive summary judgment."  1-ER-22.

On the retaliation claim, the district court found that Plaintiff had presented a prima facie case of retaliation. 1-ER-23-24. However, the court also concluded that Defendants' proffered explanation of the financial mitigation status was a legitimate reason for the termination and that Plaintiff failed to demonstrate that it was pretextual.  Thus, that claim was subject to summary judgment as well. 1-ER-24-29. Finally, summary judgment was also granted as to the wrongful

termination claim as well, since that claim was derivative of the FEHA claims. 1-ER-29.

### C. Plaintiff timely files notice of appeal.

The district court entered judgment on February 22, 2022. 1-ER-2-4. Plaintiff timely filed her notice of appeal on March 23, 2022. 2-ER-33.

## SUMMARY OF THE ARGUMENT

California's "FEHA prohibits several employment practices relating to physical disabilities," including discriminating against an employee due to his or her disability, failure to reasonably accommodate a disabled employee, and failure to engage in a good faith interactive process regarding accommodation of their disability. *Nealy v. City of Santa Monica*, 234 Cal.App.4th 359, 371 (2015). In addition, FEHA also prohibits retaliation against an employee for making a request for reasonable accommodation. Cal. Gov't Code § 12940(h), (m)(2).

Based on the facts set forth above, there were clearly triable issues of fact as to whether (a) Plaintiff could perform the essential duties of her position with or without accommodation; (b) Defendant had reasonably accommodated disability by either allowing her to work in her former position or finding an alternative position for her; (c) whether Defendant had ever engaged in a reasonable and good faith interactive process regarding Plaintiff's disability; and (d) whether

Defendant terminated Plaintiff's employment due to her request for accommodation.

As such, summary judgment never should have been granted as to Plaintiff's claims and the judgment against her must be reversed.

## ARGUMENT

### I.    STANDARD OF REVIEW

On appeal, "[s]ummary judgment… is reviewed de novo, drawing all reasonable inferences supported by the evidence in favor of the non-moving party." *Bodett v. Coxcom*, *Inc.*, 366 F.3d 736, 742 (9th Cir. 2004) (cleaned up). The reviewing court must independently "decide whether any genuine issues of material fact exist, and whether the district court correctly applied the relevant substantive law." *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1061 (9th Cir. 2002).  Because review is de novo, the reviewing court applies the same standards applicable to the district court.

A district court may grant summary judgment only if the moving party "shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The evidence must be viewed "in the light most

favorable to" the opposing party. *Stegall v. Citadel Broadcasting Co*., 350 F.3d 1061, 1065 (9th Cir. 2003). In evaluating the evidence, "the evidence of the nonmoving party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in the light most favorable to her." *Id.* (cleaned up).

"A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo,* 1061 (9th Cir. 2002), *quoting, Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In determining if issues of fact exist, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are" for the trier of fact and therefore cannot be considered on summary judgment. *Anderson,* 255. Thus, competent and specific evidence by a single declarant or witness may create a triable issue as to a material fact although opposed by many other declarations to the contrary. *U.S. v. Lot 4, Block 5 of Eaton Acres*, 904 F.2d 487, 491-492 (9th Cir. 1990).

In the context of employment discrimination claims, courts typically apply the three-stage *McDonnell Douglas* framework in evaluating a motion for summary judgment. *Nicholson v. Hyannis Air Serv.* 580 F.3d 1116, 1123 (9th Cir. 2009). At the first, stage, the court evaluates whether a plaintiff has presented a prima facie case raising an inference of discrimination. The employer then is expected to rebut

that inference by presenting evidence of a legitimate non-discriminatory basis for its employment decision.

At that point, "the plaintiff must only demonstrate that there is a genuine dispute of material fact regarding pretext. The amount of evidence required to do so is minimal." *Id.* at 1127. Courts "have held that very little evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact-finder." *Id., quoting, McGinest v. GTE Serv. Corp.,* 360 F.3d 1103, 1124 (9th Cir. 2004). Thus, whenever the plaintiff presents any "evidence, direct or circumstantial," beyond the prima facie case, "a factual question will *almost always exist* with respect to any claim of a nondiscriminatory reason." *Id.* (emphasis added.)

## II.  SUMMARY JUDGMENT AS TO CLAIMS FOR DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE MUST BE REVERSED

The district court granted summary judgment on Plaintiff's claim for disability discrimination and failure to reasonably accommodate because it concluded that she was not able to perform the essential functions of her position with or without reasonable accommodation. As set forth below, this was erroneous because there was sufficient evidence for a reasonable trier of fact to conclude that Plaintiff could perform her essential duties with reasonable accommodation – as she

had been doing for years. Moreover, no real effort at further accommodation, either by evaluating her current position or finding an alternative position, was made.

To establish a prima facie case of disability discrimination, a plaintiff must prove that: "(1) plaintiff suffers from a disability; (2) plaintiff is a qualified individual; and (3) plaintiff was subjected to an adverse employment action [e.g., termination of employment] because of the disability." *Prue v. Brady Co./San Diego, Inc.*, 242 Cal.App.4th 1367, 1378 (2015), *quoting Brundage v. Hahn*, 57 Cal.App.4th 228, 236 (1997). A qualified individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Brundage*, 57 Cal. App. 4th at 235; *see also*, *Green v. State*, 42 Cal.4th 254, 264 (2007), *accord*.

Although the employee generally has the burden of proving that she can perform the essential duties of the position, the question of who bears the burden of demonstrating that a particular duty is "essential," is undecided in California. *Lui v. City*, 211 Cal.App.4th 962, 972 (2013). Federal courts have generally decided that, where the issue is disputed, the burden of demonstrating that a particular duty is an essential job function rests on the *employer*. *Bates v. U.P.S* 511 F.3d 974, 991 (9th Cir. 2007) [agreeing with *EEOC v. Wal-Mart* 477 F.3d 561, 568 (8th Cir. 2007), that "an employer who disputes the plaintiff's claim that he

27

can perform the essential functions must put forth evidence establishing those functions"]; *Samper v. Providence St. Vincent Med. Ctr.,* 675 F.3d 1233, 1237 (9th Cir. 2012); *Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1114 (8th Cir. 1995); *Hill v. City of Phx.,* 162 F. Supp. 3d 918, 924 (D. Ariz. 2016); *Cooper v. Dignity Health,* 438 F. Supp. 3d 1002, 1009 (D. Ariz. 2020) (employer "has the burden of production in establishing what job functions of the… position are essential"); *Smith v. WM Corporate Servs.,* 2021 U.S.Dist.LEXIS 108236 (D.Ariz. June 8, 2021, No. CV-19-01579-PHX-SPL), at *12 ("The employer has the burden of establishing which job functions are essential as "much of the information which determines those essential functions lies uniquely with the employer.")

The term 'essential function' for purposes of California disability discrimination law is defined by statute:

> 'Essential functions' means the *fundamental job duties* of the employment position the individual with a disability holds or desires. 'Essential functions' does not include the marginal functions of the position.

Cal. Gov't Code § 12926(f) (emphasis added.)

The statute then goes on to list a variety of considerations and factors for determining if a job function is "essential" or "marginal." The statute notes that a job function may be essential because "the reason the position exists is to perform that function;" or "because of the limited number of employees available among whom the performance of

that job function can be distributed;" or "the function may be highly specialized." Cal. Gov't Code § 12926(f)(1)(A-C).

"'Marginal functions' of an employment position are those that, if not performed, would not eliminate the need for the job or that could be readily performed by another employee or that could be performed in an alternative way." *Nealy v. City of Santa Monica* 234 Cal.App.4th 359,[3] 373 (2015), quoting, Cal. Code Regs., tit. 2, § 11065(e)(3).

A "'reasonable accommodation' in the FEHA means… a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired." *Nadaf-Rahrov v. Neiman Marcus Group, Inc.,* Cal.App.4th 952, 974 (2008). Thus, a reasonable accommodation is one that does not fundamentally alter the job by eliminating an essential job function. *Nealy*, 234 Cal.App.4th at 375. The statute also provides examples of reasonable accommodations, including:

> Job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, … and other similar accommodations for individuals with disabilities.

Cal. Gov't Code § 12926(p)(2).

---

[3] Superseded on other grounds by Cal. Gov't Code, § 12940(m)(2).

These definitions are substantially identical to those in the federal Americans with Disabilities Act ("ADA") and federal authority is therefore commonly recognized as persuasive. See, 42 U.S.C. § 12111(8), (9); 29 C.F.R. § 1630.2(n) and (o).

> Finally:
> [T]he employer *cannot prevail* on summary judgment on a claim of failure to reasonably accommodate unless it establishes through undisputed facts that (1) reasonable accommodation was offered and refused; (2) there simply was *no vacant position* within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation; or (3) the employer did *everything in its power* to find a reasonable accommodation, but the informal, interactive process broke down because the employee failed to engage in discussions in good faith. *Jensen v. Wells Fargo Bank*, 85 Cal.App.4th 245, 263 (2000) (emphasis added).

### A. Plaintiff was able to perform the essential functions of her job with reasonable accommodation.

Here, it is undisputed that Plaintiff has a disability, and that her employment ended due to her disability, in that Defendant claimed to be unable to accommodate her disability any longer. The critical issue on which the trial court based its decision to grant summary judgment was whether she could perform the essential duties of her job with reasonable accommodation. Based on the foregoing authority, Defendant had the burden of demonstrating that there were no triable

issues of fact as to the question of whether Plaintiff could perform the core functions of her job even with a reasonable accommodation and that they had done everything within reason to accommodate her.

### 1. Plaintiff performed her job for years under the same restrictions and received a performance review days before her employment ended.

In this regard, it first must be emphasized that Ms. Calderon had worked in her position, successfully carrying out her duties even with her disability and need for accommodation since March 2015. Moreover, even when Defendants gave her a performance review on March 9, 2020, they did not raise the issue of Plaintiff's disability at any point during the 30–40-minute meeting. 3-ER-521-24. If Plaintiff was *unable to perform the essential duties of her position* at that point, how could this not have been an issue in her performance evaluation?

One week after the performance review, on March 16, 2020, Defendant suddenly decided that she was unable to do her job and that they could not accommodate her disability. Her work for Defendant ended at that point, as described above.

The implausibility of the claim that somehow, *within a week*, Plaintiff's disability went from being unworthy of mention to rendering her unfit to perform the basic functions of her job on its own should be sufficient to raise a triable issue of fact as to the issue requiring denial of summary judgment.

31

## 2. Multiple facts indicate that Plaintiff could have continued to perform her job with reasonable accommodation.

Plaintiff's disability limited her ability to engage in "prolonged standing/walking," bending, stooping, climbing, kneeling, squatting or crawling. She was also restricted from lifting or carrying anything for 10 pounds. 4-ER-693. As demonstrated below, Plaintiff could have continued to perform the essential duties of her job with reasonable accommodation.

### a. Lifting and moving heavy objects was only a minor aspect of the job and could have been accommodated, as it had in the past.

The essential function of a PCT is stated in the title: "*patient care technician*." The role involves, monitoring the patients, setting up the patient machines to monitor patients, initiating and terminating treatments. PCTs also stock, clean the clinic, set up water room, keep water logs, draw labs, and provided patient education. To the extent that heavy lifting was required, PCT's were expected to work together collaboratively and help each other. There were typically 5-6 PCT's on duty on any given shift.

Defendant contended that the essential functions of the PCT role "required heavy lifting and moving of patients; the ability to stand for prolonged periods of time and bend over; the ability to lift chemical and water solutions of up to 30 pounds; and the ability to occasionally move, with assistance, machines and equipment of up to 200 pounds." 4-ER-

807. Plaintiff, however, presented evidence disputing the contention that lifting constituted a significant portion her job.

Akram, the clinical manager, for example, testified that percentage of time a PCT is engaged in lifting is "very minor." 3-ER-519. Depending on the assignment, a PCT may lift supplies or mixtures but generally do not lift other items. 3-ER-486-87. Lifting the 30-pound solution bags for patients occurred approximately 9-12 times per day, once for each patient, over the course of a shift. 4-ER-605-06. Moving heavy equipment occurred 2-4 times per week. 4-ER-609-10. Clearly heavy lifting was not a constant or continuous requirement of the job as it would be with, for example, a UPS delivery worker.

With respect standing and sitting, Plaintiff testified that she would typically be standing for about seven hours of her shift and sitting for two hours. 4-ER-611. However, there was never any evidence presented that this could not be mitigated by allowing for more sitting and/or the use of a scooter between patients. As described below, Defendant also had provided a stool to mitigate stooping and bending.

### 3. Plaintiff had successfully performed her job with reasonable accommodation and could have continued to do so.

Further, even if it is granted that these were essential functions of the job, the question is not whether Plaintiff could perform them on her own, without assistance, but rather whether she could perform the

33

essential functions of her job *with reasonable accommodation*. "Employers must make reasonable accommodations to the disability of an individual unless the employer can demonstrate that doing so would impose an 'undue hardship.'" *Spitzer v. The Good Guys, Inc.*, 80 Cal.App.4th 1376, 1383 (2000); 2 Cal. Code of Regs. § 11068; *Sargent v. Litton Systems, Inc.*, 841 F.Supp. 956, 960 (N.D. Cal 1994). The term "reasonable accommodation" is to be interpreted flexibly. *Sargent*, 841 F.Supp. at 961. Although an employer is not expected to fundamentally alter the essential functions of the job, the law and regulations clearly require employers to "actively re-structure their way of doing business in order to accommodate the needs of their disabled employees." *Id*.

Once Plaintiff returned to work after her injuries and had the lifting restrictions, she would typically ask her supervisor or her coworkers for help when she needed to lift heavy items. 4-ER-620-22. Akram also stated he had advised her to collaborate with other PCT's, for example by trading duties with her coworkers so that she would perform duties within her restrictions for other co-workers while the co-workers would handle the lifting or similar tasks for her. 4-ER-706, 707. Redistribution of tasks and duties like these is recognized as a reasonable accommodation. *D'Angelo v. ConAgra Foods, Inc.* 422 F.3d 1220, 1233 (11th Cir. 2005) (employee could have been accommodated where several other employees were trained to perform the same functions thereby minimizing consequences for employer). Thus, with

respect to lifting there was no evidence presented that Plaintiff could not have continued to seek assistance from coworkers when needed.

Furthermore, with respect stooping and the like, Defendants admitted Plaintiff could easily be accommodated by providing a stool to be used for tasks that involved crouching or squatting and that they, in fact, had done so. 4-ER-706, 708, 760, 765. There also was no reason why Plaintiff could not have been assigned to take over more sitting tasks for other PCT's, such as handling paperwork and lab orders, or why she could not have been provided with scooter to move between patients.

Defendant and the district court also asserted that Plaintiff "admitted" that she could not perform the essential duties of her job even with reasonable accommodation. This is a mischaracterization of the deposition testimony. First, Defendant merely takes one snippet of testimony out the context of Plaintiff's entire deposition, in which Plaintiff extensively testified regarding the ways in which she *could* do her job with accommodation, as cited above. Second, the cited testimony was a one-word "no" in response to a long and confusing question with so many subparts and qualifications that it is nearly impossible what exactly the question was or what part of it she responding to. 4-ER-640-41. This is also compounded by the fact that English is not Plaintiff's first language. 3-ER-545.

35

**b.  There was no change in circumstances making these accommodations unworkable.**

Although Defendant has claimed that these accommodations could "no longer" be made for Plaintiff, they fail to provide any specific facts or evidence beyond vague assertions about "operational" issues and difficulties posed to other staff. See, e.g., 4-ER-745-46.  However, as described above, according to Akram, Plaintiff was advised to trade duties with her co-workers so that there would be no additional duties imposed on them, merely a redistribution of tasks.  Akram had also claimed that Plaintiff had been assigned to "special projects," involving tasks within her restrictions and that these assignments could no longer be assigned to her.  This argument also makes little sense. Akram claimed the special projects included "patient education, preparing labs, filing, and as needed projects." 3-ER-500.  However, when asked if that all that Plaintiff was doing, Akram admitted she was also performing typical PCT duties such as monitoring patients, monitoring vital signs, and acting as a "float" PCT.  *Id.*  Akram also admitted that patient education is part of the job of *every* PCT. *Id.*  It is also unclear why these "special projects" would no longer be needed.

Akram also admitted that there was no operational need that changed the job duties or descriptions of PCT's. 3-ER-499. Hayden similarly admitted that the "operational needs" of the clinic were unchanged between 2019 and 2020. 3-ER-458-59.  Finally, Hayden was adamant that there was no financial basis for denying Ms. Calderon

36

further accommodation and no financial hardship posed by keeping her on. 3-ER-460-61.

### c. The claim that Plaintiff's restrictions had changed is false.

Furthermore, as described above, the restrictions had remained essentially the same for more than four years. Indeed, when Akram received Plaintiff's latest doctor's note with restrictions, she forwarded it the HR with the comment "no change in work assignment or accommodations at this time." 3-ER-513. Furthermore, Akram also did not tell Hayden that the clinic was unable to accommodate Ms. Calderon. 3-ER-446-47. However, the new manager Robert Hayden falsely claimed that Plaintiff's latest restrictions had changed the situation and made it impossible to accommodate her. 4-ER-748-49.

### d. Hayden explicitly stated his discriminatory intent after his first day at the facility.

The actual reasoning behind the decision to cease accommodating Plaintiff was revealed by the email Hayden sent immediately on learning that there were two disabled employees working at the facility: "My hope is we can make the case that the business can no longer support these accommodations." 3-ER-534. In other words, Hayden simply didn't want to deal with disabled employees. Not coincidentally, both employees were gone by April 2020. 3-ER-442-43, 501.

Defendants also claimed that the decision was made in part to the fact that Plaintiff had occasionally not been abiding by the restrictions.

37

4-ER-745. But this also makes no sense and has no bearing on the question of whether Plaintiff's restrictions could be reasonably accommodated so that she could perform her job. To the extent that Plaintiff performed duties outside of her job restrictions that was because she felt that no help was available and that her needs for accommodation were not being met. 3-ER-556-59.

Based on the foregoing, a reasonable trier of fact could conclude that Ms. Calderon would have been able to perform the essential functions of her job with reasonable accommodation – as she had been doing for years before her employment ended. As such, the district court's decision to grant summary judgment on the grounds that Ms. Calderon was not a "qualified individual," was erroneous and should be reversed.

## B.    The facts indicate that Defendant was imposing a 100% healed policy, which a violation of the law.

"'100% healed' policies are per se violations of the ADA. A '100% healed' or 'fully healed' policy discriminates against qualified individuals with disabilities because such a policy" bases the decision on whether the individual is "fully healed" rather than on whether he or she can perform the essential duties of the job with or without accommodation. *McGregor v. National R.R. Passenger Corp.*, 187 F.3d 1113, 1116 (9th Cir. 1999). California law is in accord. *Gelfo v. Lockhead Martin Corp.*, 140 Cal.App.4th 34, 50 n.11 (2006).

38

As described above, Hayden learned that there were two disabled PCT's with work restrictions on the first day he visited and that same day he stated that he "hope [ed to] make the case that the business can no longer support these accommodations…" 3-ER-461-62, 534. Further, Akram stated that the determination that Plaintiff could no longer be accommodated was based on the decision that they needed "PCT's performing the *full* duties" in the facility. 3-ER-507-08 (emphasis added.) When Plaintiff asked why she couldn't be accommodated, Akram responded by telling her Defendant "needed more PCTs that can perform their *full* job duties." 3-ER-509 (emphasis added.) Moreover, both of the employees with disability restrictions were gone by April 2020. 3-ER-441-43, 501. Plaintiff and the other disabled employee were the only PCT's to lose their jobs at that time and five new PCT's were hired who did not have any work restrictions. 3-ER-501-02.

Based on these facts, a trier of fact could easily conclude that Defendant was imposing a 100% healed policy, which is a per se violation of disability discrimination laws.

## C. Defendant had a duty to offer an alternative job as a reasonable accommodation.

In addition, even if Defendant was unable to accommodate Ms. Calderon in her position as a PCT, it had a duty to accommodate her by transferring her to another position within her restrictions, if possible. "Although an employer does not have an obligation to create a new job,

39

reassign another employee, or promote a disabled employee, courts have made it clear that an employer has a *duty* to reassign a disabled employee if an already funded, vacant position at the same level exists." *Swanson v. Morongo Unified School District*, 232 Cal.App.4th 954, 970 (2014) (internal quotes and citation omitted; emphasis in original). Accordingly, in order to meet its "initial burden" on summary judgment for a failure to accommodate claim, the *employer* must demonstrate that there were no appropriate vacant positions and/or that other reasonable accommodation offers were made but declined by the employee. *Id.; see also, Jensen v. Wells Fargo Bank*, 85 Cal.App.4th 245, 263 (the employer "cannot prevail" of summary judgment unless it demonstrates that there were no vacant positions available).

Further, "when reassignment of an existing employee is the issue, the disabled employee *is entitled to preferential consideration*." *Jensen*, 265 (emphasis added). Further, the employer has an affirmative duty to seek out alternative, vacant positions for the employee; the employer cannot put this onus on the employee. *Spitzer v. The Good Guys, Inc.,* 80 Cal.App.4th 1376, 1389-1390 (Employer did not satisfactorily accommodate employee where employer told employee to apply for other positions and continually check the job hotline).

Here, Defendant cannot demonstrate that it complied with these obligations. As describe detail above, Defendant engaged in only minimal efforts to see if there was an alternative job for Plaintiff.

40

First, once Plaintiff received the three-option ultimatum, Defendant deemed it *her* responsibility to discover if there were open positions at other clinics. Defendant does not provide a list of open jobs to the employee. 3-ER-479. No one told even Plaintiff what she needed to do reach out to other clinics. 3-ER-405.

The sole effort Battles-Singleton, whose job it is to oversee the disability accommodation process, made to find an alternative position was to make a single phone call to the manager of the Van Nuys clinic and determine if there were open positions. 3-ER-395-97. While Battles-Singleton speculated that others may have reached out, she does not recall any emails to the regional clinics to see if Plaintiff could be accommodated and no evidence of such efforts has been adduced. 3-ER-397-98. Akram supposedly reached out to other clinics, but could provide no specifics or documentation. 4-ER-705. Battles-Singleton also did not even provide Plaintiff with a list of job openings. 3-ER-422. For his part, Hayden asserted that no alternative positions were available, though the basis of that assertion is unclear, at best. 4-ER-768.

This does not comply with the duty under the law, which "entail[s] affirmative action" by the employer to find a position. *Spitzer,* 80 Cal.App.4th at 1389. The duty is not fulfilled where the employee is "expected to identify possible reassignments from... job listings on her own, and... the company liaisons made little effort to identify which, if any, of the vacant positions met her limitations and qualifications or

41

could be altered to accommodate her." *Jensen,* 85 Cal.App.4th at 265. None of the facts presented by Defendant here show that it made an affirmative effort to find an alternative position for Plaintiff. Rather, they made a couple a cursory phone calls and told her to check open listings and find a job herself. Based on the foregoing, that that was patently insufficient.

Moreover, under Defendant's policy, if an employee such as Plaintiff needed to transfer to another position because of a disability, the employee would have to apply for the position and it's the "same hiring process as anybody else." 3-ER-471, 479-80. There would therefore be no preference given to Plaintiff if she applied for such an open position. 3-ER-422-23. This is in direct contradiction of *Jensen,* and the other authority cited above, which held that an employer is required to give *preferential* treatment to a disabled employee.

In deposition, Battles-Singleton identified several jobs that Plaintiff could have performed for the company, including a screener, ward clerk, and receptionist. 3-ER-424. Battles-Singleton claimed that Ms. Calderon was offered an admin position. 3-ER-424. However, no written offer of such a position has been produced and there is apparently no documentation of such an offer. Ms. Calderon denied ever receiving such an offer. 3-ER-362. Defendant has not presented any specific evidence demonstrating that no such vacant positions existed.

42

Finally, although Plaintiff did receive a letter in mid 2021 specifically offering positions at specific clinics, this occurred after about a year after litigation had been filed and did not remedy the prior violations. 3-ER-364.

Thus, Defendant's failure to locate and offer an alternative position to Plaintiff further supports the failure to accommodate and disability discrimination claims

## D. Defendant's "offer" of a leave of absence or permanent disability was not a reasonable accommodation.

Defendants may also claim that the offer of a leave of absence in its 3-option ultimatum constituted a reasonable accommodation. However, the facts described in detail above, make it clear that there was never a serious attempt to place Plaintiff on a leave of absence as nothing was done to determine her eligibility or help her go through the necessary process with Sedgwick to obtain a leave. Further, given the fact that her limitations were permanent, it is unclear how an indefinite and unpaid leave would have helped her at all.

The option of "permanent disability," was also not a serious attempt at reasonable accommodation. The purpose of a reasonable accommodation is to allow the employee to continue working – not to permanently end their employment. Moreover, they offered no guidance to Plaintiff as to what going on permanent disability would entail. Battles-Singleton did not even know what it meant to apply for

43

permanent disability and it was her job to guide management through the accommodation process. 3-ER-399.

### E. Defendants failed to follow their own disability accommodation policies.

The fact that Defendants failed to follow its own disability accommodation procedures also demonstrates that there was no serious effort to offer accommodation and that they were simply fast-tracking the end of the Ms. Calderon's employment. Under the normal reasonable accommodation process, an employee would receive a questionnaire along with their job description that is given to the doctor to fill out. 3-ER-406. The questionnaire is then reviewed by the operations team and the accommodation result is provided to the employee in a memo or letter. 3-ER-406-07. This never happened here. 3-ER-408.

According to normal procedures, a "job offer" is a document that formally offers a reasonable accommodation to an employee. 3-ER-409. Battles-Singleton is unaware if Plaintiff received a "job offer" after her restrictions were brought up in September 17, 2019. 3-ER-409-10.

According to policy, employee gets a "notice of offer of modified or alternative work" after the reasonable accommodation process is completed. 3-ER-415. This also never happened here – instead she was merely given an ultimatum effectively ending her employment. 3-ER-416-17.

44

If Defendant had actually been attempting to find a reasonable accommodation, they would have followed the normal procedures designed to aid in that process. The fact that they did not do so supports the conclusion that no real effort to accommodate Plaintiff was made.

Based on the foregoing, there were numerous issues of fact requiring a trial on the merits as to Plaintiff's claims for disability discrimination and failure to reasonably accommodate her disability. As such, summary judgment must be reversed as to those claims.

## III.   FAILURE TO ENGAGE IN GOOD FAITH INTERACTIVE PROCESS

In addition to claims for disability discrimination and failure to accommodate, California law also recognizes a separate cause of action for an employer's failure to engage in a good faith interactive process regarding an employees need for accommodation. *Gelfo v. Lockheed Martin Corp.*, 140 Cal.App.4th 34, 61 (2006); *Claudio v. Regents of University of California* 134 Cal.App.4th 224, 243 (2005). The chief requirement of the interactive process is the exchange of essential information between the employer and employee directly and without delay. *Rowe v. City and County of San Francisco*, 186 F.Supp.2d 1047, 1051 (N.D. Cal. 2002). The employer must show that it did "*everything in its power* to find a reasonable accommodation, but the informal, interactive process broke down because the employee failed to engage in

45

discussions in good faith." Jensen v. Wells Fargo Bank, 85 Cal.App.4th 245, 263 (emphasis added).

"A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith." *Id.*, *citing, Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). The trier-of-fact determines which party is responsible for the breakdown in the interactive process. *Beck*, 75 F.3d at 1135.

The district court granted summary judgment on this cause action because it concluded that Plaintiff had failed to identify any specific accommodation that could have been offered during the interactive process. 1-ER-22; *see, Scotch v. Art Institute of California-Orange County, Inc.*, 173 Cal.App.4th 986, 993 (2009).  However, as described above, there is extensive evidence of potential accommodation, including simply allowing her to continue to work under her restrictions as she had for years, or making a serious effort to find and offer alternative employment.

Defendant, however, never made a good faith effort to accommodate.  Indeed, once Hayden made it clear that his "hope" was to reach a conclusion that *no accommodation* was possible, no one made any real effort to accommodate Plaintiff.  That statement on its own demonstrates a lack of good faith effort to find an accommodation. At that point Hayden had just met Plaintiff and had never seen her work.

46

He had not done any investigation or analysis of the situation. All he knew was that she was a PCT at the facility and had a disability. A good faith interactive process can hardly result when the senior manager immediately jumps to the conclusion that no accommodation is possible.

In addition the facts adduced above regarding the disability discrimination and failure to accommodate claims, the following additional facts demonstrate that (a) Defendant never engaged in a good faith interactive process with Plaintiff and (b) that Plaintiff was not responsible for any breakdown in communications.

There were four individuals involved in the decision that Plaintiff's disability could no longer be accommodated: Akram, Hayden, Battles-Singleton and Lillibridge.

- Hayden had only two conversations with Plaintiff. In the first, she told him about her disability and work restrictions; the second was the meeting in which she was told that her disability could no longer be accommodated. 3-ER-438-41.

- Although Hayden thought some of Plaintiff's restrictions were vague, he never sought clarification from her doctor. 3-ER-463.

- Rena Battles-Singleton never had any direct communications with Plaintiff at any point. 3-ER-362, 385, 389-90, 401-02, 422-23.

47

- Debbie Lilibridge also never met with Plaintiff. 3-ER-362.

Thus, the only individual who could have engaged in any interactive process at all was Akram.  Akram did not discuss her disability status or ability to do her job in the performance review a week before the decision to end Plaintiff's employment.  Akram never asked Calderon what job duties she was physically capable of doing and does not even know what the interactive process is.  3-ER-481, 540-41. Akram never asked Calderon's doctors for input regarding the restrictions and couldn't say of anyone ever did. 3-ER-524, 529-30. Further, although Akram believed that disability accommodation issues were to be handled through the third-party vendor, Sedgwick, she took no action to facilitate that process or help put Plaintiff in contact with them.  3-ER-448, 467, 469.

Finally, there is no evidence that the lack of communication was due to Plaintiff, as acknowledged by Battles-Singleton. 3-ER-412.

Based on the foregoing, therefore, there are triable issues of fact as whether Defendants engaged in a reasonable and good faith interactive process to find a reasonable accommodation for Plaintiff. Summary judgment of this claim must therefore be reversed as well.

## IV.   RETALIATION FOR REQUESTING ACCOMMODATION

Plaintiff also alleged a claim for retaliation based on her request for disability accommodation.  FEHA makes it unlawful for an employer to retaliate against an employee for engaging in certain protected conduct, including a request for disability accommodation. Cal. Gov't Code § 12940(h), (m)(2).

A prima facie case for retaliation is made where it is shown that an adverse action was made soon after the employee's protected action. *See, e.g., Hawkins v. City of L.A.*, 40 Cal. App. 5th 384, 394 (2019) ("Circumstantial evidence such as proximity in time between protected activity and alleged retaliation may establish a causal link."); *Arteaga v. Brink's, Inc.*, 163 Cal. App. 4th 327, 353 (2008). Here, the district court correctly found that the fact that the evidence supported a prima facie case of retaliation. 1-ER-24.  Plaintiff's termination came less than four months after presenting her restrictions to Akram in September 2019. More significantly, Hayden set the wheels of termination in motion *immediately* on learning of her disability in February 2020 on his very first visit to the facility and she was terminated a few weeks later.

Once a prima facie case is made, the Defendant must present a legitimate non-discriminatory basis for the termination.  *Nicholson v. Hyannis Air Serv.* 580 F.3d 1116, 1123 (9th Cir. 2009).  Defendant here asserts that the termination was based on a legitimate decision that it

49

could no longer accommodate Plaintiff because she was unable to perform the essential duties of her job with or without accommodation.

In order to defeat summary judgment once a prima facie case has been made and a reason for termination proffered by the defendant, the plaintiff need only present "minimal" evidence of pretext. *Id.* at 1127. "[V]ery little evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact-finder." *Id., quoting, McGinest v. GTE Serv. Corp.,* 360 F.3d 1103, 1124 (9th Cir. 2004).

There is substantial evidence that the reason for termination is pretextual. First, there is extensive evidence described above that the decision that Plaintiff could not do her job with reasonable accommodation was baseless and, in fact, she had been working in the position for years.

Second, the decision was made without any real effort at a good faith interactive process and without following normal disability accommodation procedures.

Third, Hayden himself made it clear that he had no interest in reasonable accommodation of disabled employees when he declared his "hope" that the company would decide they could no longer be disabled. This statement strongly indicates discriminatory motive.

50

Finally, there is the fact that both of the employees with disability restrictions were gone by April 2020. 3-ER-442-43, 501. Plaintiff and the other disabled employee were the only PCT's to lose their jobs at that time and five new PCT's were hired who did not have any work restrictions. 3-ER-501-02. Evidence of discrimination against other similarly situated employees demonstrates discriminatory intent and therefore supports a finding of pretext. *See, e.g., Anderson v. Valspar Corp.,* (Case No. 2:10-cv-03182-GEB-EFB) 2013 U.S. Dist. LEXIS 18974, at *41 (E.D. Cal. Feb. 12, 2013); *Metoyer v. Chassman,* 504 F.3d 919, 937 (9th Cir. 2007) (stating decisionmaker's bigoted remarks may tend to show discriminatory intent even if directed at someone other than the plaintiff); *Johnson v. United Cerebral Palsy/Spastic Children's Found. of L.A. & Ventura Cntys.,* 173 Cal. App. 4th 740, 767 (2009) (approving of use of 'me too' evidence of discrimination to defeat employer's summary judgment motion in FEHA case).

Plaintiff clearly had more than "minimal" evidence of pretext and discriminatory intent and summary judgment should have been denied as to this claim as well.

## V. WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

The wrongful termination claim is premised on violations of the FEHA described above. Because there are triable issues of fact as to these claims summary judgment should have been denied as to this

claim as well. *Hanson v. Lucky Stores, Inc.*, 74 Cal.App.4th 215, 229 (1999).

## CONCLUSION

Based on the foregoing, the district court's grant of summary judgment was erroneous and must be reversed.

Date: December 2, 2022

Respectfully submitted,
JOSEPH S. SOCHER, ESQ.

*/s/  Joseph S. Socher*
Joseph S. Socher

*Attorneys for Appellant Dolores Calderon*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that: This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,059 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Century Schoolbook 14-point font.

Date: December 2, 2022             JOSEPH S. SOCHER, ESQ.


                                   */s/   Joseph S. Socher*
                                   Joseph S. Socher

                                   *Attorneys for Appellant Dolores Calderon*

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: December 2, 2022          JOSEPH S. SOCHER, ESQ.


                                */s/   Joseph S. Socher*
                                Joseph S. Socher

                                *Attorneys for Appellant Dolores Calderon*

# ADDENDUM

# Cal. Gov. Code § 12926

Section 12926 - [Effective 1/1/2023] Definitions in connection with unlawful practices

As used in this part in connection with unlawful practices, unless a different meaning clearly appears from the context:

**(a)**"Affirmative relief" or "prospective relief" includes the authority to order reinstatement of an employee, awards of backpay, reimbursement of out-of-pocket expenses, hiring, transfers, reassignments, grants of tenure, promotions, cease and desist orders, posting of notices, training of personnel, testing, expunging of records, reporting of records, and any other similar relief that is intended to correct unlawful practices under this part.

**(b)**"Age" refers to the chronological age of any individual who has reached a 40th birthday.

**(c)**Except as provided by Section 12926.05, "employee" does not include any individual employed by that person's parent, spouse, or child or any individual employed under a special license in a nonprofit sheltered workshop or rehabilitation facility.

**(d)**"Employer" includes any person regularly employing five or more persons, or any person acting as an agent of an employer, directly or indirectly, the state or any political or civil subdivision of the state, and cities, except as follows:

"Employer" does not include a religious association or corporation not organized for private profit.

**(e)**"Employment agency" includes any person undertaking for compensation to procure employees or opportunities to work.

**(f)**"Essential functions" means the fundamental job duties of the employment position the individual with a disability holds or desires. "Essential functions" does not include the marginal functions of the position.

  **(1)**A job function may be considered essential for any of several reasons, including, but not limited to, any one or more of the following:

    **(A)**The function may be essential because the reason the position exists is to perform that function.

    **(B)**The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed.

    **(C)**The function may be highly specialized, so that the incumbent in the position is hired based on expertise or the ability to perform a particular function.

  **(2)**Evidence of whether a particular function is essential includes, but is not limited to, the following:

    **(A)**The employer's judgment as to which functions are essential.

    **(B)**Written job descriptions prepared before advertising or interviewing applicants for the job.

    **(C)**The amount of time spent on the job performing the function.



1

**(D)**The consequences of not requiring the incumbent to perform the function.

**(E)**The terms of a collective bargaining agreement.

**(F)**The work experiences of past incumbents in the job.

**(G)**The current work experience of incumbents in similar jobs.

**(g)**

**(1)**"Genetic information" means, with respect to any individual, information about any of the following:

**(A)**The individual's genetic tests.

**(B)**The genetic tests of family members of the individual.

**(C)**The manifestation of a disease or disorder in family members of the individual.

**(2)**"Genetic information" includes any request for, or receipt of, genetic services, or participation in clinical research that includes genetic services, by an individual or any family member of the individual.

**(3)**"Genetic information" does not include information about the sex or age of any individual.

**(h)**"Labor organization" includes any organization that exists and is constituted for the purpose, in whole or in part, of collective bargaining or of dealing with employers concerning grievances, terms or conditions of employment, or of other mutual aid or protection.

**(i)**"Medical condition" means either of the following:

**(1)**Any health impairment related to or associated with a diagnosis of cancer or a record or history of cancer.

**(2)**Genetic characteristics. For purposes of this section, "genetic characteristics" means either of the following:

**(A)**Any scientifically or medically identifiable gene or chromosome, or combination or alteration thereof, that is known to be a cause of a disease or disorder in a person or that person's offspring, or that is determined to be associated with a statistically increased risk of development of a disease or disorder, and that is presently not associated with any symptoms of any disease or disorder.

**(B)**Inherited characteristics that may derive from the individual or family member, that are known to be a cause of a disease or disorder in a person or that person's offspring, or that are determined to be associated with a statistically increased risk of development of a disease or disorder, and that are presently not associated with any symptoms of any disease or disorder.

**(j)**"Mental disability" includes, but is not limited to, all of the following:

**(1)**Having any mental or psychological disorder or condition, such as intellectual disability, organic brain syndrome, emotional or mental illness, or specific learning

disabilities, that limits a major life activity. For purposes of this section:

**(A)**"Limits" shall be determined without regard to mitigating measures, such as medications, assistive devices, or reasonable accommodations, unless the mitigating measure itself limits a major life activity.

**(B)**A mental or psychological disorder or condition limits a major life activity if it makes the achievement of the major life activity difficult.

**(C)**"Major life activities" shall be broadly construed and shall include physical, mental, and social activities and working.

**(2)**Any other mental or psychological disorder or condition not described in paragraph (1) that requires special education or related services.

**(3)**Having a record or history of a mental or psychological disorder or condition described in paragraph (1) or (2), which is known to the employer or other entity covered by this part.

**(4)**Being regarded or treated by the employer or other entity covered by this part as having, or having had, any mental condition that makes achievement of a major life activity difficult.

**(5)**Being regarded or treated by the employer or other entity covered by this part as having, or having had, a mental or psychological disorder or condition that has no present disabling effect, but that may become a mental disability as described in paragraph (1) or (2).

"Mental disability" does not include sexual behavior disorders, compulsive gambling, kleptomania, pyromania, or psychoactive substance use disorders resulting from the current unlawful use of controlled substances or other drugs.

**(k)**"Veteran or military status" means a member or veteran of the United States Armed Forces, United States Armed Forces Reserve, the United States National Guard, and the California National Guard.

**(l)**"On the bases enumerated in this part" means or refers to discrimination on the basis of one or more of the following: race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, age, sexual orientation, or veteran or military status.

**(m)**"Physical disability" includes, but is not limited to, all of the following:

**(1)**Having any physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss that does both of the following:

**(A)**Affects one or more of the following body systems: neurological, immunological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine.

**(B)**Limits a major life activity. For purposes of this section:

**(i)**"Limits" shall be determined without regard to mitigating measures such as medications, assistive devices, prosthetics, or reasonable accommodations, unless the mitigating measure itself limits a major life activity.

**(ii)**A physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss limits a major life activity if it makes the achievement of the major life activity difficult.

**(iii)**"Major life activities" shall be broadly construed and includes physical, mental, and social activities and working.

**(2)**Any other health impairment not described in paragraph (1) that requires special education or related services.

**(3)**Having a record or history of a disease, disorder, condition, cosmetic disfigurement, anatomical loss, or health impairment described in paragraph (1) or (2), which is known to the employer or other entity covered by this part.

**(4)**Being regarded or treated by the employer or other entity covered by this part as having, or having had, any physical condition that makes achievement of a major life activity difficult.

**(5)**Being regarded or treated by the employer or other entity covered by this part as having, or having had, a disease, disorder, condition, cosmetic disfigurement, anatomical loss, or health impairment that has no present disabling effect but may become a physical disability as described in paragraph (1) or (2).

**(6)**"Physical disability" does not include sexual behavior disorders, compulsive gambling, kleptomania, pyromania, or psychoactive substance use disorders resulting from the current unlawful use of controlled substances or other drugs.

**(n)**Notwithstanding subdivisions (j) and (m), if the definition of "disability" used in the federal Americans with Disabilities Act of 1990 ( Public Law 101-336 ) would result in broader protection of the civil rights of individuals with a mental disability or physical disability, as defined in subdivision (j) or (m), or would include any medical condition not included within those definitions, then that broader protection or coverage shall be deemed incorporated by reference into, and shall prevail over conflicting provisions of, the definitions in subdivisions (j) and (m).

**(o)**"Race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, age, sexual orientation, or veteran or military status" includes a perception that the person has any of those characteristics or that the person is associated with a person who has, or is perceived to have, any of those characteristics.

**(p)**"Reasonable accommodation" may include either of the following:

**(1)**Making existing facilities used by employees readily accessible to, and usable by, individuals with disabilities.



**(2)**Job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

**(q)**"Religious creed," "religion," "religious observance," "religious belief," and "creed" include all aspects of religious belief, observance, and practice, including religious dress and grooming practices. "Religious dress practice" shall be construed broadly to include the wearing or carrying of religious clothing, head or face coverings, jewelry, artifacts, and any other item that is part of an individual observing a religious creed. "Religious grooming practice" shall be construed broadly to include all forms of head, facial, and body hair that are part of an individual observing a religious creed.

**(r)**

  **(1)**"Sex" includes, but is not limited to, the following:

   **(A)**Pregnancy or medical conditions related to pregnancy.

   **(B)**Childbirth or medical conditions related to childbirth.

   **(C)**Breastfeeding or medical conditions related to breastfeeding.

  **(2)**"Sex" also includes, but is not limited to, a person's gender. "Gender" means sex, and includes a person's gender identity and gender expression. "Gender expression" means a person's gender-related appearance and behavior whether or not stereotypically associated with the person's assigned sex at birth.

**(s)**"Sexual orientation" means heterosexuality, homosexuality, and bisexuality.

**(t)**"Supervisor" means any individual having the authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or the responsibility to direct them, or to adjust their grievances, or effectively to recommend that action, if, in connection with the foregoing, the exercise of that authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

**(u)**"Undue hardship" means an action requiring significant difficulty or expense, when considered in light of the following factors:

  **(1)**The nature and cost of the accommodation needed.

  **(2)**The overall financial resources of the facilities involved in the provision of the reasonable accommodations, the number of persons employed at the facility, and the effect on expenses and resources or the impact otherwise of these accommodations upon the operation of the facility.

  **(3)**The overall financial resources of the covered entity, the overall size of the business of a covered entity with respect to the number of employees, and the number, type, and location of its facilities.

  **(4)**The type of operations, including the composition, structure, and functions of the workforce of the entity.

**(5)**The geographic separateness or administrative or fiscal relationship of the facility or facilities.

**(v)**"National origin" discrimination includes, but is not limited to, discrimination on the basis of possessing a driver's license or identification card granted under Section 12801.9 of the Vehicle Code.

**(w)**"Race" is inclusive of traits historically associated with race, including, but not limited to, hair texture and protective hairstyles.

**(x)**"Protective hairstyles" includes, but is not limited to, such hairstyles as braids, locks, and twists.

*Ca. Gov. Code § 12926*

Amended by Stats 2022 ch 482 (AB 1766),s 3, eff. 1/1/2023.
Amended by Stats 2020 ch 36 (AB 3364),s 32, eff. 1/1/2021.
Amended by Stats 2020 ch 370 (SB 1371),s 139, eff. 1/1/2021.
Amended by Stats 2019 ch 58 (SB 188),s 3, eff. 1/1/2020.
Amended by Stats 2017 ch 799 (AB 1556),s 3, eff. 1/1/2018.
Amended by Stats 2016 ch 683 (AB 488),s 1, eff. 1/1/2017.
Amended by Stats 2014 ch 452 (AB 1660),s 1, eff. 1/1/2015.
Amended by Stats 2013 ch 691 (AB 556),s 3, eff. 1/1/2014.
Amended by Stats 2013 ch 76 (AB 383),s 86, eff. 1/1/2014.
Amended by Stats 2012 ch 701 (AB 2386),s 1.5, eff. 1/1/2013.
Amended by Stats 2012 ch 457 (SB 1381),s 16, eff. 1/1/2013.
Amended by Stats 2012 ch 448 (AB 2370),s 16, eff. 1/1/2013.
Amended by Stats 2012 ch 287 (AB 1964),s 1, eff. 1/1/2013.
Amended by Stats 2011 ch 719 (AB 887),s 14.5, eff. 1/1/2012.
Amended by Stats 2011 ch 261 (SB 559),s 9, eff. 1/1/2012.
Amended by Stats 2004 ch 700 (SB 1234),s 4, eff. 1/1/2005
Amended by Stats 2003 ch 164 (AB 196),s 1, eff. 1/1/2004.
Amended by Stats 2000 ch 1049 (AB 2222), s 5, eff. 1/1/2001.
Previously Amended October 10, 1999 (Bill Number: AB 1001) (Chapter 592).
Previously Amended October 10, 1999 (Bill Number: AB 1670) (Chapter 591).
Amended September 2, 1999 (Bill Number: SB 1185) (Chapter 311).
This section is set out more than once due to postponed, multiple, or conflicting amendments.

 casetext

# Cal. Gov. Code § 12940

Section 12940 - Unlawful employment practices

It is an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:

**(a)** For an employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or veteran or military status of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment.

**(1)** This part does not prohibit an employer from refusing to hire or discharging an employee with a physical or mental disability, or subject an employer to any legal liability resulting from the refusal to employ or the discharge of an employee with a physical or mental disability, if the employee, because of a physical or mental disability, is unable to perform the employee's essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger the employee's health or safety or the health or safety of others even with reasonable accommodations.

**(2)** This part does not prohibit an employer from refusing to hire or discharging an employee who, because of the employee's medical condition, is unable to perform the employee's essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger the employee's health or safety or the health or safety of others even with reasonable accommodations. Nothing in this part shall subject an employer to any legal liability resulting from the refusal to employ or the discharge of an employee who, because of the employee's medical condition, is unable to perform the employee's essential duties, or cannot perform those duties in a manner that would not endanger the employee's health or safety or the health or safety of others even with reasonable accommodations.

**(3)** Nothing in this part relating to discrimination on account of marital status shall do either of the following:

**(A)** Affect the right of an employer to reasonably regulate, for reasons of supervision, safety, security, or morale, the working of spouses in the same department, division, or facility, consistent with the rules and regulations adopted by the council.

**(B)** Prohibit bona fide health plans from providing additional or greater benefits to employees with dependents than to those employees without or with fewer dependents.

**(4)** Nothing in this part relating to discrimination on account of sex shall affect the right of an employer to use veteran status as a factor in employee selection or to give special consideration to Vietnam-era veterans.



**(5)**

**(A)**This part does not prohibit an employer from refusing to employ an individual because of the individual's age if the law compels or provides for that refusal. Promotions within the existing staff, hiring or promotion on the basis of experience and training, rehiring on the basis of seniority and prior service with the employer, or hiring under an established recruiting program from high schools, colleges, universities, or trade schools do not, in and of themselves, constitute unlawful employment practices.

**(B)**The provisions of this part relating to discrimination on the basis of age do not prohibit an employer from providing health benefits or health care reimbursement plans to retired persons that are altered, reduced, or eliminated when the person becomes eligible for Medicare health benefits. This subparagraph applies to all retiree health benefit plans and contractual provisions or practices concerning retiree health benefits and health care reimbursement plans in effect on or after January 1, 2011.

**(b)**For a labor organization, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or veteran or military status of any person, to exclude, expel, or restrict from its membership the person, or to provide only second-class or segregated membership or to discriminate against any person because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or veteran or military status of the person in the election of officers of the labor organization or in the selection of the labor organization's staff or to discriminate in any way against any of its members or against any employer or against any person employed by an employer.

**(c)**For any person to discriminate against any person in the selection, termination, training, or other terms or treatment of that person in any apprenticeship training program, any other training program leading to employment, an unpaid internship, or another limited duration program to provide unpaid work experience for that person because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or veteran or military status of the person discriminated against.

**(d)**For any employer or employment agency to print or circulate or cause to be printed or circulated any publication, or to make any nonjob-related inquiry of an employee or applicant, either verbal or through use of an application form, that expresses, directly or indirectly, any limitation, specification, or discrimination as to race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or veteran or military status, or any intent to make any such limitation, specification, or discrimination. This part does not prohibit an employer or employment agency from inquiring into the age of an applicant, or from specifying age limitations, if the law compels or provides for that action.

**(e)**

**(1)**Except as provided in paragraph (2) or (3), for any employer or employment agency to require any medical or psychological examination of an applicant, to make any medical or psychological inquiry of an applicant, to make any inquiry whether an applicant has a mental disability or physical disability or medical condition, or to make any inquiry regarding the nature or severity of a physical disability, mental disability, or medical condition.

**(2)**Notwithstanding paragraph (1), an employer or employment agency may inquire into the ability of an applicant to perform job-related functions and may respond to an applicant's request for reasonable accommodation.

**(3)**Notwithstanding paragraph (1), an employer or employment agency may require a medical or psychological examination or make a medical or psychological inquiry of a job applicant after an employment offer has been made but prior to the commencement of employment duties, provided that the examination or inquiry is job related and consistent with business necessity and that all entering employees in the same job classification are subject to the same examination or inquiry.

**(f)**

**(1)**Except as provided in paragraph (2), for any employer or employment agency to require any medical or psychological examination of an employee, to make any medical or psychological inquiry of an employee, to make any inquiry whether an employee has a mental disability, physical disability, or medical condition, or to make any inquiry regarding the nature or severity of a physical disability, mental disability, or medical condition.

**(2)**Notwithstanding paragraph (1), an employer or employment agency may require any examinations or inquiries that it can show to be job related and consistent with business necessity. An employer or employment agency may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that worksite.

**(g)**For any employer, labor organization, or employment agency to harass, discharge, expel, or otherwise discriminate against any person because the person has made a report pursuant to Section 11161.8 of the Penal Code that prohibits retaliation against hospital employees who report suspected patient abuse by health facilities or community care facilities.
**(h)**For any employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part.
**(i)**For any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this part, or to attempt to do so.
**(j)**

**(1)**For an employer, labor organization, employment agency, apprenticeship training program or any training program leading to employment, or any other person, because of race, religious creed, color, national origin, ancestry, physical disability, mental disability,

 casetext

medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or veteran or military status, to harass an employee, an applicant, an unpaid intern or volunteer, or a person providing services pursuant to a contract. Harassment of an employee, an applicant, an unpaid intern or volunteer, or a person providing services pursuant to a contract by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An employer may also be responsible for the acts of nonemployees, with respect to harassment of employees, applicants, unpaid interns or volunteers, or persons providing services pursuant to a contract in the workplace, if the employer, or its agents or supervisors, knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing cases involving the acts of nonemployees, the extent of the employer's control and any other legal responsibility that the employer may have with respect to the conduct of those nonemployees shall be considered. An entity shall take all reasonable steps to prevent harassment from occurring. Loss of tangible job benefits shall not be necessary in order to establish harassment.

**(2)**The provisions of this subdivision are declaratory of existing law, except for the new duties imposed on employers with regard to harassment.

**(3)**An employee of an entity subject to this subdivision is personally liable for any harassment prohibited by this section that is perpetrated by the employee, regardless of whether the employer or covered entity knows or should have known of the conduct and fails to take immediate and appropriate corrective action.

**(4)**

**(A)**For purposes of this subdivision only, "employer" means any person regularly employing one or more persons or regularly receiving the services of one or more persons providing services pursuant to a contract, or any person acting as an agent of an employer, directly or indirectly, the state, or any political or civil subdivision of the state, and cities. The definition of "employer" in subdivision (d) of Section 12926 applies to all provisions of this section other than this subdivision.

**(B)**Notwithstanding subparagraph (A), for purposes of this subdivision, "employer" does not include a religious association or corporation not organized for private profit, except as provided in Section 12926.2.

**(C)**For purposes of this subdivision, "harassment" because of sex includes sexual harassment, gender harassment, and harassment based on pregnancy, childbirth, or related medical conditions. Sexually harassing conduct need not be motivated by sexual desire.

**(5)**For purposes of this subdivision, "a person providing services pursuant to a contract" means a person who meets all of the following criteria:

**(A)**The person has the right to control the performance of the contract for services and discretion as to the manner of performance.



**(B)**The person is customarily engaged in an independently established business.

**(C)**The person has control over the time and place the work is performed, supplies the tools and instruments used in the work, and performs work that requires a particular skill not ordinarily used in the course of the employer's work.

**(k)**For an employer, labor organization, employment agency, apprenticeship training program, or any training program leading to employment, to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring.

**(l)**

**(1)**For an employer or other entity covered by this part to refuse to hire or employ a person or to refuse to select a person for a training program leading to employment or to bar or to discharge a person from employment or from a training program leading to employment, or to discriminate against a person in compensation or in terms, conditions, or privileges of employment because of a conflict between the person's religious belief or observance and any employment requirement, unless the employer or other entity covered by this part demonstrates that it has explored any available reasonable alternative means of accommodating the religious belief or observance, including the possibilities of excusing the person from those duties that conflict with the person's religious belief or observance or permitting those duties to be performed at another time or by another person, but is unable to reasonably accommodate the religious belief or observance without undue hardship, as defined in subdivision (u) of Section 12926, on the conduct of the business of the employer or other entity covered by this part. Religious belief or observance, as used in this section, includes, but is not limited to, observance of a Sabbath or other religious holy day or days, reasonable time necessary for travel prior and subsequent to a religious observance, and religious dress practice and religious grooming practice as described in subdivision (q) of Section 12926. This subdivision shall also apply to an apprenticeship training program, an unpaid internship, and any other program to provide unpaid experience for a person in the workplace or industry.

**(2)**An accommodation of an individual's religious dress practice or religious grooming practice is not reasonable if the accommodation requires segregation of the individual from other employees or the public.

**(3)**An accommodation is not required under this subdivision if it would result in a violation of this part or any other law prohibiting discrimination or protecting civil rights, including subdivision (b) of Section 51 of the Civil Code and Section 11135 of this code.

**(4)**For an employer or other entity covered by this part to, in addition to the employee protections provided pursuant to subdivision (h), retaliate or otherwise discriminate against a person for requesting accommodation under this subdivision, regardless of whether the request was granted.

**(m)**

**(1)**For an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee. Nothing in this subdivision or in paragraph (1) or (2) of subdivision (a) shall be construed

to require an accommodation that is demonstrated by the employer or other covered entity to produce undue hardship, as defined in subdivision (u) of Section 12926, to its operation.

**(2)**For an employer or other entity covered by this part to, in addition to the employee protections provided pursuant to subdivision (h), retaliate or otherwise discriminate against a person for requesting accommodation under this subdivision, regardless of whether the request was granted.

**(n)**For an employer or other entity covered by this part to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition.

**(o)**For an employer or other entity covered by this part, to subject, directly or indirectly, any employee, applicant, or other person to a test for the presence of a genetic characteristic.

**(p)**Nothing in this section shall be interpreted as preventing the ability of employers to identify members of the military or veterans for purposes of awarding a veteran's preference as permitted by law.

*Ca. Gov. Code § 12940*

Amended by Stats 2022 ch 48 (SB 189),s 36, eff. 6/30/2022.
Amended by Stats 2020 ch 36 (AB 3364),s 33, eff. 1/1/2021.
Amended by Stats 2018 ch 955 (SB 1300),s 2, eff. 1/1/2019.
Amended by Stats 2017 ch 799 (AB 1556),s 6, eff. 1/1/2018.
Amended by Stats 2015 ch 122 (AB 987),s 2, eff. 1/1/2016.
Amended by Stats 2014 ch 302 (AB 1443),s 1, eff. 1/1/2015.
Amended by Stats 2013 ch 691 (AB 556),s 4.5, eff. 1/1/2014.
Amended by Stats 2013 ch 88 (SB 292),s 1, eff. 1/1/2014.
Amended by Stats 2012 ch 287 (AB 1964),s 2, eff. 1/1/2013.
Amended by Stats 2011 ch 719 (AB 887),s 18.5, eff. 1/1/2012.
Amended by Stats 2011 ch 261 (SB 559),s 14, eff. 1/1/2012.
Amended by Stats 2010 ch 130 (AB 1814),s 1, eff. 1/1/2011.
Amended by Stats 2003 ch 671 (AB 76),s 1, eff. 1/1/2004.
Amended by Stats 2002 ch 525 (AB 1599),s 1, eff. 1/1/2003.
Amended by Stats 2002 ch 664 (AB 3034),s 94, eff. 1/1/2003.
Amended by Stats 2001 ch 909 (AB 1475), s 1, eff. 1/1/2002.
Amended by Stats 2000 ch 1049 (AB 2222), s 7.5, eff. 1/1/2001.
Previously Amended October 10, 1999 (Bill Number: AB 1001) (Chapter 592).
Previously Amended October 10, 1999 (Bill Number: AB 1670) (Chapter 591).
See Stats 2003 ch 671 (AB 76), s 2.
See Stats 2000 ch 1049 (AB 2222), s 11.

