**Case No.  22-55305**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

DOLORES CALDERON,

*Plaintiff-Appellant*,

v.

BIO-MEDICAL APPLICATIONS OF MISSION HILLS, INC.;
FRESENIUS MANAGEMENT SERVICES, INC.; BIOMEDICAL
APPLICATIONS MANAGEMENT COMPANY, INC.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Central District of California
No. 2:20-cv-07869-PSG-JEM
The Honorable Philip S. Gutierrez

---

### DEFENDANTS/APPELLEES' ANSWERING BRIEF

---

Regina A. Petty (SBN 106163)
Amy L. Lessa (SBN 202872)
Darcey M. Groden (SBN 296492)
FISHER & PHILLIPS LLP
4747 Executive Drive, Suite 1000
San Diego, California  92121
Telephone:  (858) 597-9600
E-Mail:  alessa@fisherphillips.com
Attorneys for Defendants-Appellees
Bio-Medical Applications of Mission
Hills, Inc., and Fresenius Management
Services, Inc.

Joel W. Rice (Illinois SBN 6186847)
FISHER & PHILLIPS LLP
10 South Wacker Drive, Suite 3450
Chicago, IL 60606
Telephone:  (312) 346-8061
E-Mail:jrice@fisherphillips.com
Attorneys for Defendants-Appellees
Bio-Medical Applications of Mission
Hills, Inc., and Fresenius Management
Services, Inc.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................iv-ix

INTRODUCTION ........................................................................1

JURISDICTIONAL STATEMENT ........................................................2

STATEMENT OF THE ISSUES.........................................................3

STATEMENT OF THE CASE.............................................................4

I.      FACTUAL BACKGROUND.........................................................4

     A.      Calderon's Hiring and Her Job Duties as a PCT ..................................4

          1.      Calderon's Written Job Description Detailing Physical
                Demands of the PCT Job .........................................5

          2.      Calderon's Testimony as to the Physical Demands
                of the Job........................................................6

     B.      Calderon's 2014 Back Injury, Leaves, and Initial Restrictions ...........7

     C.      In September 2019, Calderon Informs BMA Mission Hills of
          New Significantly Increased Physical Restrictions .............................9

     D.      BMA Mission Hills Went Into "Mitigation Status" in February
          2020, and New Director of Operations Robert Hayden Meets
          with Manager Akram and Calderon ......................................11

     E.      Akram and Hayden Collaborated with Human Resources in
          Assessing the Feasibility of Potential Accommodations for
          Calderon ....................................................................13

     F.      BMA Mission Hills Presented Calderon with Further Options
          and Calderon Ceased Communicating................................16

II.     PROCEDURAL BACKGROUND .............................................17

i

  A. Prior to Summary Judgment, Calderon Dismissed Eight Defendants and One Claim ..................................................17

  B. The District Court Granted Summary Judgment on All Remaining Claims ....................................................................19

    1. First Cause of Action for Disability Discrimination.................19

    2. Second and Third Causes of Action for Failure to Reasonably Accommodate and Engage in Interactive Process ...............................................................................22

    3. Fourth Cause of Action for Retaliation....................................22

    4. Fifth Cause of Action for Wrongful Termination....................23

SUMMARY OF ARGUMENT ....................................................................23

STANDARD OF REVIEW .........................................................................25

ARGUMENT ..............................................................................................26

III. THE DISTRICT COURT PROPERLY RULED THAT CALDERON'S DISABILITY DISCRIMINATION CLAIM FAILED AS A MATTER OF LAW ...........................................................26

  A. The Legal Standard for a Disability Discrimination Claim ...............26

  B. The District Court Properly Ruled that Calderon Failed to Make Out a Prima Facie Case of Disability Discrimination as a Matter of Law....................................................................27

    1. The Standard for Determining Whether a Job Function is Essential ...................................................................27

    2. The District Court Correctly Ruled that the Physical Demands of the PCT Role were Essential Functions .................................................................................28

ii

3.      The District Court Properly Ruled that Calderon
        Could Not Perform the Essential Physical Functions
        of a PCT ...................................................................................32

4.      The District Court Properly Ruled That There Were
        No Available Reasonable Accommodations That
        Would Have Permitted Calderon to Perform the Essential
        Functions of a PCT ...................................................................38

IV.   THE DISTRICT COURT PROPERLY RULED THAT
      CALDERON'S SECOND CAUSE OF ACTION FOR FAILURE
      TO ACCOMODATE FAILED AS A MATTER OF LAW.........................45

V.    THE DISTRICT COURT PROPERLY RULED THAT
      CALDERON'S THIRD CAUSE OF ACTION FOR FAILURE
      TO ENGAGE IN THE INTERACTIVE PROCESS FAILED AS A
      MATTER OF LAW....................................................................................49

VI.   THE DISTRICT COURT PROPERLY RULED THAT CALDERON'S
      FOURTH CAUSE OF ACTION FOR RETALIATION FAILED AS A
      MATTER OF LAW....................................................................................52

VII.  THE DISTRICT COURT PROPERLY RULED THAT
      CALDERON'S FIFTH CAUSE OF ACTION FOR WRONGFUL
      TERMINATION IN VIOLATION OF PUBLIC POLICY  FAILED
      AS A MATTER OF LAW.........................................................................63

CONCLUSION .....................................................................................................64

STATEMENT OF RELATED CASES ................................................................64

CERTIFICATE OF COMPLIANCE
PURSUANT TO CIRCUIT RULE 32-1 .............................................................. 65

iii

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Alamillo v. BNSF Railway Co.*,
869 F.3d 916 (9th Cir. 2017) .................................................................50

*Aragon v. Republic Silver State Disposal Inc.*,
292 F.3d 654 (9th Cir. 2002) .................................................................55

*Beck v. Univ. of Wis. Bd. of Regents*,
75 F.3d 1130 (7th Cir. 1996) .................................................................51

*Bohmker v. Oregon*,
903 F.3d 1029 (9th Cir. 2018) ...............................................................35

*Ceja-Corona v. CVS Pharmacy, Inc.*,
664 Fed.App'x. 649 (9th Cir. 2016) ..............................................33, 47, 49, 51

*Chisolm v. 7-Eleven, Inc.*,
814 Fed.App'x. 194 (9th Cir. 2020) ...........................................33, 47

*Com. Space Mgmt. Co., Inc. v. Boeing Co., Inc.*,
193 F.3d 1074 (9th Cir. 1999) .................................................................3

*D'Angelo v. ConAgra Foods, Inc.*,
422 F.3d 1220 (11th Cir. 2005) .................................................44, 45

*Dark v. Curry Cnty.*,
451 F.3d 1078 (9th Cir. 2006) ...............................................................29

*Dep't of Fair Emp. & Housing v. Lucent Techs., Inc.*,
642 F.3d 728 (9th Cir. 2011) .........................................25, 55, 57, 58

*In re E.R. Fegert, Inc.*,
887 F.2d 955 (9th Cir. 1989) .................................................................42

*Earl v. Nielsen Media Research, Inc.*,
658 F.3d 1108 (9th Cir. 2011) ...............................................................26

iv

*Elzeftawy v. Michael Baker Int'l, Inc.*,
  854 Fed.App'x. 931 (9th Cir. 2021) ................................................. 50

*Engel v. Time Warner Cable*,
  No. EDCV 19-074 PSG (KKx), 2020 WL 2114933
  (C.D. Cal. Jan. 30, 2020) ................................................................ 47

*FTC. v. Publ'g Clearing House, Inc.*,
  104 F.3d 1168 (9th Cir. 1997) ....................................................... 35

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ....................................................................... 25

*Grantz v. State Farm Mut. Auto. Ins. Co.*,
  420 Fed.App'x. 692 (9th Cir. 2011) ............................................... 48

*Hanline v. Cnty. of Ventura*,
  No. CV 15-8808-VAP, 2017 WL 11682912
  (C.D. Cal. Aug. 7, 2017) ................................................................ 34

*Hoang Minh Tran v. Gore*,
  584 Fed.App'x. 678 (9th Cir. 2014) ................................................. 3

*Latham v. Cambria Co. LLC*,
  No. SA CV 16-0561-DOC, 2017 WL 125013
  (C.D. Cal. Jan. 12, 2017) ............................................................... 36

*Lawler v. Montblanc N. Am.*,
  No. 10-CV-01131-LHK, 2011 WL 1466129
  (N.D. Cal. Apr. 15, 2011) ............................................................... 29

*Maffei v. N. Ins. Co.*,
  12 F.3d 892 (9th Cir. 1993) ............................................................ 25

*Matkovich v. Costco Wholesale Corp.*,
  No. CV 15-2057 MRW, 2020 WL 2519576
  (C.D. Cal. May 14, 2020) ......................................................... 29, 37

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 492 (1973) .................................................................. 26, 52

v

*Nat'l Ass'n of Optometrists & Opticians v. Harris*,
   682 F.3d 1144 (9th Cir. 2012) ...............................................25

*Perez v. Alameda Cnty. Sheriff's Off.*,
   678 Fed.App'x. 621 (9th Cir. 2017) ...........................................59, 61

*Powell v. Anheuser-Busch Inc.*,
   No. CV 09-729-JFW, 2012 WL 12953439
   (C.D. Cal. Sept. 24, 2012)...................................................29

*Saracay v. Marriott Int'l, Inc.*,
   No. 2:18-cv-03295-SJO(RAOx), 2019 WL 4194308
   (C.D. Cal. June 13, 2019) ...........................................28, 33

*Sargent v. Litton Systems, Inc.*,
   841 F.Supp. 959 (N.D. Cal. 1994)..............................................44, 45

*Sneddon v. ABF Freight Cysts.*,
   489 F.Supp. 2d 1124 (S.D. Cal. Aug. 26, 2007)................................64

*U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*,
   281 F.3d 929 (9th Cir. 2002) .................................................25

*U.S. v. $133,420.00 in U.S. Currency*,
   672 F.3d 629 (9th Cir. 2012) .................................................35

*Urbina v. Comcast Cable Comm'cns Mgmt., LLC*,
   788 Fed.App'x. 522 (9th Cir. 2019) ................................37, 40, 51, 53

*Wang v. Sony Picture Entm't, Inc.*,
   721 Fed.App'x. 634 (9th Cir. 2018) ...........................................37

*Watkins v. Ameripride Servs.*,
   375 F.3d 821 (9th Cir. 2004) .................................................43

*Whittaker Corp. v. Execuair Corp.*,
   953 F.2d 510 (9th Cir. 1992) .................................................42

*Zimerman v. Bodycote Thermal Processing Inc.*,
   No. 2:20-cv-07229-SB-MAA, 2021 WL 3932289
   (C.D. Cal. June 14, 2021) ....................................................60

vi

**State Cases**

*Atkins v. City of L.A.*,
  8 Cal. App. 5th 696 (2017) ...........................................................................38, 46

*Furtado v. State Pers. Bd.*,
  212 Cal. App. 4th 729 (2013) ...............................................................................46

*Guz v. Bechtel Nat'l, Inc.*,
  24 Cal. 4th 317 (2000) ..........................................................................................26

*Hanson v. Lucky Stores, Inc.*,
  74 Cal. App. 4th 215 (1999) .................................................................................64

*Hersant v. Dep't of Soc. Servs.*,
  57 Cal. App. 4th 997 (1997) .................................................................................55

*Holmes v. Gen. Dynamics Corp.*,
  17 Cal. App. 4th 1418 (1993) ...............................................................................64

*Jensen v. Wells Fargo Bank*,
  85 Cal. App. 4th 245 (2000) .................................................................................50

*King v. United Parcel Serv., Inc.*,
  152 Cal. App. 4th 426 (2007) ...............................................................................35

*Lui v. City & Cnty. of S.F.*,
  211 Cal. App. 4th 962 (2012) .........................................................................32, 40

*Moore v. Regents of Univ. of Cal.*,
  248 Cal. App. 4th 216 (2016) ...............................................................................60

*Morgan v. Regents of Univ. of Cal.*,
  88 Cal. App. 4th 52 (2000) ...................................................................................52

*Nadaf–Rahrov v. Neiman Marcus Group, Inc.*,
  166 Cal. App. 4th 952 (2008) .........................................................................39, 50

*Nealy v. City of Santa Monica*,
  234 Cal. App. 4th 359 (2015) ........................................ 39, 40, 42, 45, 46, 49, 51

*Prue v. Brady Co./San Diego Inc.*,
  242 Cal. App. 4th 1367 (2015) .......................................................................27, 45

*Raine v. City of Burbank*,
135 Cal. App. 4th 1215 (2006) ...............................................................43, 48, 54

*Scotch v. Art Inst. of Cal.*,
173 Cal. App. 4th 986 (2009) .....................................................................49, 51

*Shirvanyan v. Los Angeles Community College Dist.*,
59 Cal. App. 5th 82 (2020) .................................................................................51

*Shoemaker v. Myers*,
52 Cal. 3d 1 (1990) ..............................................................................................64

*Swanson v. Morengo Unified Sch. Dist.*,
232 Cal. App. 4th 954 (2014) .............................................................................46

*Wilson v. Cnty. of Orange*,
169 Cal. App. 4th 1185 (2009) ...........................................................................45

*Yanowitz v. L'Oreal USA, Inc.*,
36 Cal. 4th 1028 (2005) ......................................................................................52

**State Statutes**

CALIFORNIA GOVERNMENT CODE § 12926(f) (West 2022) .....................................27

CALIFORNIA GOVERNMENT CODE § 12926(f)(2) (West 2022).................................28

CALIFORNIA GOVERNMENT CODE § 12940(a)(1) (West 2022) ...............................38

CALIFORNIA GOVERNMENT CODE § 12940(m)........................................................45

**Rules**

Federal Rule of Civil Procedure 32(d)(3)(B).........................................................34

Federal Rule of Civil Procedure 41(a)(2) .................................................................3

**Regulations**

CALIFORNIA CODE OF REGULATIONS Title 2, § 11065(e)(2)(C) (2022)...................41

CALIFORNIA CODE OF REGULATIONS Title 2, § 11065(p)(2)(E) (2022) ..................40

viii

CALIFORNIA CODE OF REGULATIONS Title 2, § 11068(i) (2022)..............................56

CALIFORNIA CODE OF REGULATIONS Title 2, § 11068(b) (2022)............................40

CALIFORNIA CODE OF REGULATIONS Title 2, § 11068(d) (2022)............................46

CALIFORNIA CODE OF REGULATIONS Title 2, § 11068(d)(3)–(4) (2022) ...........43, 54

CALIFORNIA CODE OF REGULATIONS Title 2, § 11069(a) (2022)............................61

ix

# INTRODUCTION

Dolores Calderon was employed by Bio-Medical Applications of Mission Hills, Inc. ("BMA Mission Hills") in the position of a Patient Care Technician ("PCT") at a dialysis clinic treating severely ill patients with end stage kidney failure/renal disease. Calderon's job as a PCT was physically demanding, including the ability to lift heavy objects, stoop and bend, and to stand for most of the ten-plus hour shift. These physical demands were not peripheral – but central – to performance of a PCT's job, and they constituted essential functions of her position, as evidenced by the job description and witness testimony, including Calderon's own testimony.

In March 2015, Calderon sustained a workers' compensation injury. After she returned from leave, her doctor restricted her ability to lift, bend and stoop, and stand in a manner that impeded her ability to perform the essential duties of her position. For a period of time, BMA Mission Hills attempted to accommodate her by having other PCTs assist with some of her essential physical duties, but this proved impracticable as Calderon worked outside of her restrictions because of the time urgent demands for patient care.

By the spring of 2020, Calderon's medical restrictions on her physical activity had become even more severe, and BMA Mission Hills was experiencing financial and operational challenges that did not afford it the luxury of having other

1

PCTs take over Calderon's essential duties. The company could not locate light duty vacancies to which she could transfer. Calderon was apprised of this in a March 18, 2020 letter, which gave her the option of continuing to look for other position openings, take a leave of absence, or apply for permanent disability. A little over a year later, after Calderon failed to communicate with BMA Mission Hills as to any of these options, Calderon's employment was terminated.

As the district court correctly concluded, Calderon's claims founder as a matter of law because she has not and cannot adduce evidence of a reasonable accommodation that would have permitted her to perform the essential physical demands of her PCT position. As demonstrated herein, Calderon's attacks on the district court's well-reasoned decision rest upon cherry picked evidence divorced from context, conclusory assertions in her declaration that were properly disregarded by the district court, or petty quibbles or criticisms of the company's accommodation process that simply do not create a genuine issue of material fact as to pretext or any violation of the law on the part of the company.

## JURISDICTIONAL STATEMENT

Appellees Bio-Medical Applications of Mission Hills, Inc. and Fresenius Management Services, Inc. ("FMS") agree with the jurisdictional statement as it relates to them, but note that additional Defendant Bio-Medical Applications Management Company, Inc. was previously dismissed without prejudice pursuant

2

to Federal Rule of Civil Procedure 41(a)(2). (District Court ECF No. 56, 57.) There is no indication that Calderon is purporting to appeal from that previous voluntary dismissal, but, in any event, Calderon's voluntary dismissal terminated federal jurisdiction over Bio-Medical Applications Management Company, Inc., and this Court lacks jurisdiction over it. *Hoang Minh Tran v. Gore*, 584 Fed.App'x. 678, 678 (9th Cir. 2014); *Com. Space Mgmt. Co., Inc. v. Boeing Co., Inc.*, 193 F.3d 1074, 1076 (9th Cir. 1999).

## STATEMENT OF THE ISSUES

1.    Whether the district court correctly ruled as a matter of law that Calderon had failed to make out a prima facie case of disability discrimination because she was not a qualified individual in light of her inability to perform the essential physical duties of her position, and the absence of any reasonable accommodation that would have permitted her to do so.

2.    Whether the district court correctly ruled that Calderon's reasonable accommodation claim failed as a matter of law as she had failed to adduce evidence of a reasonable accommodation that would have permitted her to perform the essential duties of her position, and had not identified any vacant positions consistent with her physical limitations for which she was qualified.

3.    Whether the district court correctly denied Calderon's claim for failure to engage in the interactive process where Calderon had not adduced

3

evidence of an available reasonable accommodation, and in view of Calderon's own failure to participate in the interactive process.

4.     Whether the district court correctly ruled as a matter of law that BMA Mission Hills and FMS had articulated legitimate, non-retaliatory and non-discriminatory reasons for the adverse action that were not a pretext for a retaliatory or discriminatory motive.

5.     Whether the district court correctly ruled as a matter of law that Calderon's wrongful termination claim failed in light of the failure of her California Fair Employment and Housing Act claims.

## STATEMENT OF THE CASE

### I.  FACTUAL BACKGROUND

#### A. Calderon's Hiring and Her Job Duties as a PCT

Calderon was hired as a full-time Patient Care Technician at BMA Mission Hills in 2007. 2-ER-158–159 [UMF #1]; 4-ER-576:21–577:14. BMA Mission Hills is a dialysis clinic, and Patient Care Technicians ("PCTs") are responsible for providing life-saving hemodialysis therapy to critically ill patients under a highly regimented process pursuant to doctor's prescribed orders. 4-ER-667–668 (*see,* Job Description generally and "Patient Treatment" duties); 4-ER-605:7–12, 763:7–9. The physically demanding job duties of a PCT remained the same throughout Calderon's employment. 4-ER-603:20–604:8.

4

### 1. Calderon's Written Job Description Detailing Physical Demands of the PCT Job

Calderon signed a written job description for her PCT role in 2010, and again in October 2017. 2-ER-159–160 [UMF #2–3]; 4-ER-602:4–11, 603:4–604:8, 622:6–13, 622:25–623:4, 660–662, 667–668. The job duties were largely consistent between the two job descriptions she signed. 4-ER-660–662, 667–668.

Both the 2010 and 2017 job descriptions have a section titled "Physical Demands and Working Conditions." 4-ER-661, 668. While the 2017 version includes bullet point formatting, the language is otherwise identical and states, in pertinent part: "The physical demands and work environment characteristics described here are representative of those an employee encounters while performing the essential functions of this job… The position provides direct patient care that regularly involves heavy lifting and moving of patients, and assisting with ambulation…and requires frequent, prolonged periods of standing, and the employee must be able to bend over. The employee may occasionally be required to move, with assistance, machines and equipment of up to 200 lbs., and may lift chemical and water solutions of up to 30 lbs. up as high as 5 feet…" 2-ER-160–164 [UMF #4]; 4-ER-661, 668.

5

### 2. Calderon's Testimony as to the Physical Demands of the Job

Calderon's deposition testimony underscored that the PCT position was, in fact, physically demanding. Calderon was asked about the various physical demands in the job description listed above – including how often she had to perform the tasks and what the tasks actually encompassed. Calderon's testimony correlating to each of the requirements is set forth immediately below:

**"[H]eavy lifting and moving of patients, and assisting with ambulation":** As a PCT, Calderon saw approximately nine to twelve patients a day. 4-ER-605:4–6. For those patients in a wheelchair, Calderon had to assist the patient out of the wheelchair and into the dialysis chair for treatment and, when treatment was over, out of the dialysis chair and back into the wheelchair. 4-ER-605:13–606:11. Calderon explained that she tended to have two patients in a wheelchair each shift. 4-ER-607:25–608:5.[1]

**"[F]requent, prolonged periods of standing, and the employee must be able to bend over":** Calderon testified that, in the course of a 10-hour workday, she spent in excess of seven hours standing. 4-ER-610:4–16.

---

[1] Calderon's supervisor, Mahwish Akram, testified that 97% to 98% of patients weighed more than 100 pounds. 4-ER-702:22–703:5.

6

**"The employee may occasionally be required to move, with assistance, machines and equipment of up to 200 lbs."**: In a five-day work week, Calderon would have to move a machine weighing up to 200 pounds two to three times, and sometimes four. 4-ER-608:6–11, 608:22–609:4. Thus, while this was not an everyday task, it was one Calderon performed multiple times a week. 4-ER-609:2–4.

**"The employee . . . may lift chemical and water solutions of up to 30 lbs. up as high as 5 feet"**: Calderon had to prepare and lift a chemical and water solution weighing up to 40 pounds for every patient she saw as part of the dialysis process. 4-ER-609:7–20. As noted above, she regularly treated nine to twelve patients per shift. 4-ER-605:4–6.

### B. Calderon's 2014 Back Injury, Leaves, and Initial Restrictions

In March 2014, Calderon filed a workers' compensation claim arising from an injury to her back. 2-ER-164 [UMF #5]; 4-ER-577:15–578:1. Calderon subsequently took a leave of absence related to her injury and returned in 2015 without incident. 2-ER-164–165 [UMF #6–7]; 4-ER-611:22–612:5.

Upon Calderon's return on March 30, 2015, she signed a written accommodation offer. 2-ER-165 [UMF #8]; 4-ER-614:10–615:9, 616:17–25, 664–665. The offer confirmed, "restrictions are no Heavy lifting, 50% pre injury." 4-

7

ER-665. Apart from the restriction on heavy lifting, there were no other limitations set forth in the March 2015 offer.

BMA Mission Hills was able to accommodate Calderon consistent with the less restrictive 2015 work restrictions. 4-ER-621:12–15, 646:24–647:1.[2] Calderon later underwent an evaluation by an Agreed Medical Examiner in connection with her workers' compensation claim, and an Agreed Medical Evaluation Report and Supplemental Report were prepared. 3-ER-370–372. The April 15, 2015, AME Supplemental Report clarified that the no-heavy lifting restriction meant Calderon should not lift more than 20–25 pounds on a regular basis, and probably should never lift more than 40 pounds. 3-ER-370–372. The Report also stated for the first time that Calderon should not do repetitive bending or stooping as part of her regular job activities, although occasional bending or stooping was permissible. 3-ER-370–372.

Between approximately December 20, 2016, and February 3, 2017, Calderon was accommodated with another leave of absence as she was temporarily totally disabled. 2-ER-170 [UMF #11]; 4-ER-632:2–633:11, 696. When that leave ended,

---

[2] Calderon testified that notwithstanding the company's accommodation of her during this time period, she frequently worked outside of her lifting restrictions at her own initiative because she grew impatient waiting for her co-workers or supervisor to assist her. 4-ER-617:16–25, 619:18–621:15, 664–665. However, this was not sanctioned or approved by any company supervisor. 3-ER-493:5–19; 4-ER-621:12–15.

8

Calderon again returned to work. 2-ER-170 [UMF #12]; 4-ER-633:9–11. BMA Mission Hills also accommodated Calderon with an FMLA leave of about one month in November 2018 to care for her mother. 2-ER-170–171 [UMF #13]; 4-ER-624:17–625:21, 670–688.

### C. In September 2019, Calderon Informs BMA Mission Hills of New Significantly Increased Physical Restrictions

In late 2018, Calderon's physical restrictions were extended beyond the limitations on lifting and no repetitive bending or stooping. Specifically, Calderon's primary treating physician for her workers' compensation claim imposed the following increased restrictions:

- No lifting/carrying more than 10 pounds (down from 20-25 pounds on a regular basis and 40 pounds as a maximum);

- No prolonged standing/walking (standing added);

- No bending, stooping, climbing (expanded from no <u>repetitive</u> bending or stooping, and no prior limitation on climbing); and

- No kneeling, squatting, or crawling (expanded from no <u>repetitive</u> squatting).

2-ER-110–111 [ADMF #78]; 3-ER-373. Calderon's doctor stated that if these more expanded restrictions could not be accommodated upon her return to work, then she would be classified as temporarily totally disabled. 3-ER-373. Although

9

the doctor's note was provided to Calderon in 2018, she did not inform anyone at BMA Mission Hills until she met with her new Clinical Manager, Mahwish Akram, in September 2019. In that meeting, Calderon informed Akram that she had these new restrictions and wanted to request an accommodation. 3-ER-488:16–489:5. Upon Akram's request, Calderon provided Akram with her 2018 doctor's note. 3-ER-489:7–10.

Although the restrictions were onerous, Akram collaborated with Calderon to come up with short-term accommodations while human resources determined potential long-term accommodations. 3-ER-490:5–23; 4-ER-705:1–24. For example, Calderon was provided with a stool to enable her to sit while she cannulated patients. 4-ER-705:8–21, 707:8–15. Calderon was also advised to pair up with other PCTs so that they could help her with duties she could not perform while Calderon covered some of their duties she could physically perform. 4-ER-705:8–21, 707:8–15.

Despite these initial efforts to accommodate Calderon, Akram soon became aware that Calderon was not adhering to her restrictions. 4-ER-706:1–4, 707:16–708:4. This was concerning as Calderon risked injury to herself and potentially compromised patient care/safety by working outside of her stringent restrictions. 4-ER-756:6–16. When Akram expressed concern that Calderon was not following her restrictions, Calderon stated that other people were not helping her. 3-ER-

10

492:6–9.[3] Akram told Calderon that she should have come to her, and subsequently instituted weekly meetings with Calderon to discuss her restrictions, to remind her to wait for help, and to contact Akram immediately if she was having issues instead of taking actions on her own. 3-ER-492:10–13, 493:5–13. Nonetheless, Calderon continued to work outside of her restrictions endangering herself and the patients. 3-ER-493:14–19.

### D. BMA Mission Hills Went Into "Mitigation Status" in February 2020, and New Director of Operations Robert Hayden Meets with Manager Akram and Calderon

In February 2020, BMA Mission Hills went into "mitigation status" – that is, it was managed by a different division responsible for overseeing unprofitable clinics – because it was not operationally and financially sound. 2-ER-181–182 [UMF #21]; 4-ER-712:1–13, 740:2–7, 775:14–18 at ¶ 3. Not only did BMA Mission Hills operate at a loss of several hundred thousand dollars annually, but it also had negative patient growth, was running inefficient employee schedules, and had unnecessary overhead positions that were non-patient benefiting. 4-ER-713:11–16, 775:19–24 at ¶ 4. These inefficiencies hindered the Mission Hills

---

[3] Calderon's difficulty in locating other staff members who could timely absorb the more physically demanding portions of her job merely underscored the impracticability in the long run of the accommodations Akram temporarily offered in the fall of 2019.

11

clinic's ability to increase and improve upon its critical primary focus–treating patients.

In January 2020, in light of the operational issues identified above, and the company's mitigation status, Robert Hayden was informed that he would take over as a Director of Operations to review BMA Mission Hill's operational requirements, clinical outcomes of patients, and staffing needs in this challenging environment. 2-ER-182 [UMF #22]; 4-ER-741:13–20. Hayden began managing the facility in mid-February 2020. 4-ER-740:2–7.

On February 18, 2020, Hayden made his first visit to the Mission Hills clinic and, as part of that visit, met with Akram to discuss the clinic's staffing needs. 2-ER-182–185 [UMF #23]; 4-ER-743:2–744:12, 764:16–19. Akram and Hayden discussed the number of patients in the facility and the clinic's need for PCTs to perform the full range of their essential duties to meet the clinic's needs. 3-ER-507:6–9.

This meeting was the first time that Hayden learned of Calderon and her physical restrictions. 2-ER-182–185 [UMF #23]; 4-ER-743:2–744:12. Akram brought up her concerns that Calderon's restrictions were hindering the operational needs of the clinic. 3-ER-442:13–23; 4-ER-744:13–745:11. Calderon's restrictions prevented her from performing her primary roles and responsibilities and her co-workers were taking on a lot of additional work to cover the essential duties that

12

Calderon could not perform. 4-ER-715:15–21, 744:24–745:11. Specifically, Calderon's restrictions prevented her from transferring patients, managing or stocking the supply room, transferring supplies to the treatment floor, and carrying special acid or baths for dialysis patients. 4-ER-756:6–16, 757:25–758:6, 763:1–22. Akram told Hayden that Calderon's bending and stooping restrictions prevented Calderon from keeping the patient care area clean. 4-ER-756:6–16.

Hayden told Akram that they needed to review Calderon's restrictions with Human Resources. 4-ER-749:15–22. That same day, on February 18, 2020, Hayden e-mailed human resources employee Theresa Hogan Woodman seeking guidance and advice on how to proceed. 3-ER-533, 4-ER-752:2–20.

### E. Akram and Hayden Collaborated with Human Resources in Assessing the Feasibility of Potential Accommodations for Calderon

Hayden's escalation of the accommodation review led to the participation of Senior Employee Relations Manager Rena Battles-Singleton and Workers' Compensation Risk Manager Debbie Lillibridge. 2-ER-185–192 [UMF #24]; 4-ER-776:5–10 at ¶ 7, 782:8–14 at ¶ 2, 782:22–28 at ¶¶ 5–6.

Hayden, Akram, Battles-Singleton, and Lillibridge had three to four conversations discussing possible accommodations for Calderon. 4-ER-753:7–755:20, 764:16–765:3. As part of this process, they discussed the essential functions of the PCT position, which of those functions Calderon could (or could

13

not) perform, and they considered what further accommodations could potentially be provided. 4-ER-757:20–758:6, 759:10–18.

In March 2020, after this deliberative process concluded, Hayden and Akram determined that Calderon could not be permanently accommodated at the Mission Hills Clinic as a PCT. 4-ER-709:14–710:24, 711:11–23, 716:4–15, 728:14–729:15. In addition to the fact that the clinic was in mitigation status (such that they needed to more efficiently align staffing with the clinic's operational needs), in March 2020, the COVID-19 pandemic hit the country with a vengeance. 4-ER-724:25–725:6. As a result, the Mission Hills clinic was often short-staffed because employees were calling out sick. 2-ER-192–193 [UMF #25]; 4-ER-724:25–725:15, 726:16–727:1. The Mission Hills clinic simply could not continue to pull PCTs from their own patients who were receiving life-saving treatment to assist Calderon with her essential duties. 4-ER-725:22–726:3.

As Calderon herself admitted in her deposition, she was unable to actually perform the duties of a PCT when taking into account all of her restrictions:

> Q     And if – if the Mission Hills clinic considered all of your restrictions and continued to keep you in a [PCT duty] – PCT role but [and] not require you to do any lifting, did not require you to do any prolonged standing or walking, did not require any bending or stooping or

14

climbing, and did not require you to do any kneeling,

squatting or crawling -- in your opinion, would you be

able to perform the patient care duties without being able

to do any of those things combined with note *[sic]* being

able to lift over ten pounds?

A    No.

2-ER-174–178 [UMF #16]; 4-ER-639:24–640:9.

However, that was not the end of the accommodation review process by Hayden, Akram and their team. Ultimately, the group landed on three different potential accommodations or avenues still available to Calderon: (1) find an available position at another clinic consistent with her restrictions, (2) apply for a leave of absence, or (3) apply for permanent disability. 4-ER-731:10–23, 760:18–761:3. Additionally, both Akram and Battles-Singleton reached out to other clinics in the area to see if there were administrative positions available that could accommodate Calderon's restrictions, but they were unable to locate any at that time. 2-ER-193–196 [UMF #26]; 4-ER-704:3–12, 729:16–730:5, 761:12–19, 766:24–767:11, 776:11–13 at ¶ 8, 783:1–5 at ¶ 7.

15

### F. BMA Mission Hills Presented Calderon with Further Options and Calderon Ceased Communicating

On March 16, 2020, Akram and Hayden (with Battles-Singleton attending by telephone) met with Calderon to inform her that her restrictions could no longer be accommodated at the Mission Hills clinic and explained the three options available to her (find a suitable position at another clinic, apply for a leave of absence, or apply for permanent disability). 3-ER-452:23–454:9, 455:10–456:18, 502:24–503:5, 508:18–25.

On March 18, 2020, Calderon was provided a letter memorializing the three options available to her. 2-ER-196–197 [UMF #27]; 4-ER-588:16–589:4, 590:20–591:11, 657.

After receiving the March 18, 2020 letter, which did not inform Calderon that her employment was terminated (4-ER-657), Calderon made no attempt to communicate with BMA Mission Hills or explore any of the three options further. For example, Calderon did not contact BMA Mission Hills or FMS with any questions after receipt of the March 18 letter. 2-ER-215, 220 [UMF #33, 41]; 4-ER-586:7–9, 587:4–8, 642:23–643:4, 783:6–7 at ¶ 8. Nor did Calderon take any further steps to search for an open position beyond contacting one clinic. 4-ER-597:5–11. And Calderon never applied for a leave of absence or permanent disability. 2-ER-208–214 [UMF #31–32]; 4-ER-600:21–23, 601:4–7.

16

Because Calderon ceased communicating and took no other actions, she defaulted into leave of absence status – where she remained through May 17, 2021, when the new Director of Operations for BMA Mission Hills administratively separated Calderon after noting she had not worked any shifts in the prior year. 2-ER-221–228 [UMF #42]; 4-ER-783:8–11 at ¶ 9, 786.

On May 26, 2021, after the administrative separation, Human Resources sent Calderon a letter regarding her current status as administratively separated, but advising that she was still eligible to apply for disability or to find a position at another clinic that could accommodate her physical restrictions, and informing her of six clinics in the greater Southern California area that had open administrative positions for her to consider. 2-ER-228–236 [UMF #43]; 4-ER-783:12–17 at ¶ 10, 786. Calderon never responded to that letter. 2-ER-236 [UMF #44]; 4-ER-783:18–19 at ¶ 11.

## II. PROCEDURAL BACKGROUND

### A. Prior to Summary Judgment, Calderon Dismissed Eight Defendants and One Claim

On July 28, 2020, Calderon filed a Complaint in Los Angeles County Superior Court against BMA Mission Hills, FMS, and seven additional entities. (District Court ECF No. 1-1 at 4; No. 1-5 at 2:11–16, ¶ 2.) On August 27, 2020, after an intervening First Amended Complaint was filed in the same Court against

17

the same entities (District Court ECF No. 1-2 at 4; No. 1-5 at 2:20–3:2, ¶ 4), BMA Mission Hills and the other served entities removed the case to the Central District of California. (District Court ECF No. 1.)

On December 4, 2020, Calderon filed a Second Amended Complaint against BMA Mission Hills, FMS, and Bio-Medical Applications Management Company, Inc. (dropping the other entities), alleging the following causes of action:

1. Disability Discrimination in Violation of California Government Code § 12940(a);

2. Failure to Provide a Reasonable Accommodation in Violation of California Government Code § 12940(m);

3. Failure to Engage in the Interactive Process in Violation of California Government Code § 12940(n);

4. Retaliation for Requesting Accommodation in Violation of California Government Code § 12940(m);

5. Wrongful Termination in Violation of Public Policy; and

6. Declaratory Relief (since dismissed by Stipulation, District Court ECF No. 60).

(District Court ECF No. 42.)

On January 11, 2021, BMA Mission Hills and FMS filed answers to the Second Amended Complaint. (District Court ECF No. 47, 48.) On March 3, 2021,

18

pursuant to the parties' joint motion, the district court dismissed Defendant Bio-Medical Applications Management Company, Inc. from the case without prejudice. (District Court ECF No. 56, 57.)

### B. The District Court Granted Summary Judgment on All Remaining Claims

On February 15, 2022, the district court granted BMA Mission Hills and FMS's motion for summary judgment on all of Calderon's remaining causes of action in the Second Amended Complaint in a thorough and well-reasoned decision. 1-ER-6–30.

### 1. First Cause of Action for Disability Discrimination

The district court reasoned that in order to establish a *prima facie* case for disability discrimination or failure to accommodate under the Fair Employment and Housing Act, Calderon needed to be a qualified individual who could perform the essential functions of a PCT, including the physical requirements of the role. 1-ER-15, 21.

**Physical Demands as Essential Functions.** As a preliminary matter, the district court evaluated whether certain physical demands—including lifting, standing, stooping and bending—were among the essential functions of the PCT position, looking at: (1) the written job description, (2) the employer's judgment, and (3) the amount of time Calderon spent performing various physical duties. 1-

19

ER-15–17. After examining all of the evidence, including Calderon's own testimony and admissions, the district court concluded:

> [A] jury could not reasonably conclude that lifting and moving patients, bending, and lifting solutions of up to 30 pounds are not required to perform at least the role's patient care duties – which Plaintiff identifies as essential. Further based on the job description, Plaintiff's own testimony, and the lack of any contradictory evidence, a jury could not reasonably conclude that prolonged standing is not required to perform the role's essential functions. Plaintiff thus fails to raise a genuine dispute as to whether these physical demands are required to perform the role's essential functions.

1-ER-18.

**Calderon's Inability to Perform Essential Physical Functions.** Next, the district court turned to the question of whether Calderon could in fact perform those essential functions with or without reasonable accommodation. 1-ER-15, 21. The district court concluded that the record contained "ample evidence" of Calderon's inability to perform the physical demands of the PCT role with or without reasonable accommodation. 1-ER-18. First, Calderon's medical

20

restrictions precluded her from performing the duties which were essential functions of the PCT position. 1-ER-18. Second, when Calderon's restrictions were listed at her deposition and she was asked if she could perform the PCT job with those restrictions, Calderon unequivocally responded "No." 1-ER-18–19. Third, other deposition testimony, including Calderon's own, confirmed that Calderon could not perform the essential functions of the PCT job. 1-ER-19.

The district court rejected Calderon's bald assertion in a declaration – unsupported by any facts and contrary to her deposition testimony – that she was able to perform the essential functions of the role, citing to Ninth Circuit precedent rejecting the ability of such self-serving declarations to create a disputed issue of material fact on a motion for summary judgment. 1-ER-19.

**Calderon's Failure to Identify Reasonable Accommodations.** The district court also rejected Calderon's attempt to point to other potential accommodations, explaining either that they did not permit Calderon to perform the essential functions of her job or they would have required her employer to exempt her from performing the job's essential functions. 1-ER-19–20. The district court also found unavailing Calderon's argument that she could have been reassigned to a vacant position because there was ample evidence that there were no such vacant positions for which she was qualified, and Calderon herself was unable to identify any such open positions. 1-ER-20–21.

21

## 2. Second and Third Causes of Action for Failure to Reasonably Accommodate and Engage in Interactive Process

The district court explained that, in order to prevail on a claim for failure to reasonably accommodate, such an accommodation must have been available. 1-ER-21–22. Because Calderon was unable to identify such a reasonable accommodation, for much the same reasons discussed by the district court in dispatching the disability discrimination claim, the accommodation claim also failed. *Id.* Likewise, given the unavailability of any reasonable accommodation, Calderon's claim for failure to engage in the interactive process fell by the wayside as well. 1-ER-22.

## 3. Fourth Cause of Action for Retaliation

The district court likewise concluded that Calderon had not raised a genuine issue of material fact as to her retaliation claim. First, the district court found that BMA Mission Hills and FMS had satisfied their burden of articulating legitimate, non-retaliatory reasons for their decision[4] – specifically, Calderon's inability to perform the essential functions of her job with or without reasonable accommodation. 1-ER-24–25.

---

[4] The district court found that Calderon had sufficiently established a *prima facie* case of retaliation based upon the temporal proximity between Calderon's request for accommodations in September 2019 and the adverse employment decision in March 2020. 1-ER-23–24.

22

The district court next turned to whether Calderon had demonstrated pretext. 1-ER-25–29. The district court thoroughly addressed and rejected in turn each of Calderon's arguments in support of pretext, concluding that "Plaintiff has not provided the specific and substantial evidence of pretext needed to overcome the legitimate, nonretaliatory reason for her termination set forth by Defendants." 1-ER-29.

### 4. Fifth Cause of Action for Wrongful Termination

The wrongful termination in violation of public policy claim failed, reasoned the district court, because "the court finds no underlying statute that was violated." 1-ER-29.

## SUMMARY OF ARGUMENT

Each of the district court's summary judgment determinations was correct and should be affirmed by this Court.

First, the district court correctly ruled that Calderon had not made out a *prima facie* case of disability discrimination because she was not a qualified individual who could perform the essential functions of her patient care position with or without a reasonable accommodation. The physical demands of the PCT position—including lifting, bending and stooping, and near constant standing—were essential duties that Calderon's severe medical restrictions prevented her from performing. Her inability to perform them, and her failure to identify any

23

available reasonable accommodation or vacant position consistent with her restrictions are, taken together, fatal to her disability discrimination claim.

Second, Calderon's stand-alone reasonable accommodation claim fails for the same reason: she simply is not able to identify an available reasonable accommodation that would have permitted her to perform her position's essential physical demands. Nor can she identify a vacant position available as of the spring of 2020 that she was capable of performing, and to which she could have been transferred.

Third, for much the same reason, Calderon's claim for failure to engage in the interactive process legally founders as she is not able to identify a reasonable accommodation that would have been available as a result of such process. Moreover, the undisputed evidence demonstrates that BMA Mission Hills made serious, collaborative efforts to identify a reasonable accommodation for Calderon, but was unable to do so. If anything, Calderon herself ceased communicating with BMA Mission Hills rather than engaging in the interactive process.

Fourth, Calderon's retaliation claim likewise fails as a matter of law because, as the district court correctly concluded, BMA Mission Hills articulated a legitimate, non-retaliatory reason for the adverse action: namely, the inability to reasonably accommodate Calderon's severe medical restrictions and her inability to perform the essential physical demands of the job.

24

Calderon's shotgun attacks on the company's explanation are simply not the sort of "substantial evidence" required by this Circuit to establish pretext as a matter of law. None of Calderon's criticisms of the company's accommodation process, her conclusory assertions in her declaration, or her cherry-picked evidence are sufficient to show that BMA Mission Hills' explanation is a pretext for either disability discrimination or retaliation.

Finally, Calderon's public policy wrongful termination claim fails because such claim rises or falls with the underlying California statutory claims, which the district court correctly concluded lacked legal merit.

## STANDARD OF REVIEW

The Court reviews a district court's decision on summary judgment *de novo*. *Dep't of Fair Emp. & Housing v. Lucent Techs., Inc.*, 642 F.3d 728, 736 (9th Cir. 2011). The Court may affirm summary judgment on any ground supported by the record. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012).

Exclusion of evidence at the summary judgment stage is reviewed for abuse of discretion. *U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 934 (9th Cir. 2002). This Court affirms evidentiary rulings unless they are manifestly erroneous and prejudicial. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 142 (1997); *Maffei v. N. Ins. Co.*, 12 F.3d 892, 897 (9th Cir. 1993).

25

**ARGUMENT**

### III. THE DISTRICT COURT PROPERLY RULED THAT CALDERON'S DISABILITY DISCRIMINATION CLAIM FAILED AS A MATTER OF LAW

#### A. The Legal Standard for a Disability Discrimination Claim

For claims of discrimination and retaliation under California's Fair Employment and Housing Act (FEHA), courts apply the burden-shifting test articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 492 (1973). *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). Under the *McDonnell Douglas* burden-shifting framework, the plaintiff must first make a *prima facie* showing of discrimination. The burden then shifts to the employer to show the employment action was motivated by legitimate, nondiscriminatory reasons. *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 355–56 (2000). If the employer does so, the burden shifts to the employee to demonstrate the proffered reason is false or a "pretext" for discrimination. *Id.* at 356.[5]

To establish a *prima facie* case of disability discrimination, Calderon was required to prove: (1) she suffered from a disability, (2) she was a qualified

---

[5] Because the district court properly concluded that Calderon had not made out a prima facie case of disability discrimination as a matter of law, the issue of pretext is not discussed in this Section III. However, BMA Mission Hills refers the Court to its discussion of pretext in the context of Calderon's retaliation claim, which applies equally to her disability discrimination claim.

individual, and (3) she suffered an adverse employment action because of her disability. *Prue v. Brady Co./San Diego Inc.*, 242 Cal. App. 4th 1367, 1378 (2015). As the district court correctly found, Calderon could not make out a prima facie case because she was not a qualified individual who could perform the essential functions of her position with or without a reasonable accommodation.

### B. The District Court Properly Ruled that Calderon Failed to Make Out a Prima Facie Case of Disability Discrimination as a Matter of Law

#### 1. The Standard for Determining Whether a Job Function is Essential

FEHA defines the term "essential functions" to mean "the fundamental job duties of the employment position the individual with a disability holds or desires" and excludes "marginal functions of the position." CAL. GOV'T CODE § 12926(f) (West 2022).

FEHA provides a non-exhaustive list of evidence which can be examined to determine whether a particular function is essential:

> (A) The employer's judgment as to which functions are essential.
>
> (B) Written job descriptions prepared before advertising or interviewing applicants for the job.
>
> (C) The amount of time spent on the job performing the function.

27

(D) The consequences of not requiring the incumbent to perform the function.

(E) The terms of a collective bargaining agreement.

(F) The work experiences of past incumbents in the job.

(G) The current work experience of incumbents in similar jobs.

CAL. GOV'T CODE § 12926(f)(2) (West 2022).

### 2. The District Court Correctly Ruled that the Physical Demands of the PCT Role were Essential Functions

Calderon's Opening Brief gives short shrift to an analysis of the essential functions of her role because it is not favorable to her contention that she was able to perform such functions. As the district court did below, Appellees provide such an analysis here. *See Saracay v. Marriott Int'l, Inc.*, No. 2:18-cv-03295-SJO(RAOx), 2019 WL 4194308, at *5 (C.D. Cal. June 13, 2019) (determining the essential functions based on the job description and employee's testimony).

As the district court correctly found, there is a surfeit of evidence from a variety of sources that the demanding physical requirements of the PCT role – such as lifting, bending or stooping, and near constant standing – were essential functions of Calderon's position.

**Job Description.** "An employer's job description is considered to be the most reliable evidence of what a particular job's essential functions are." *Powell v. Anheuser-Busch Inc.*, No. CV 09-729-JFW (VBKx), 2012 WL 12953439, at *9 (C.D. Cal. Sept. 24, 2012); *Lawler v. Montblanc N. Am.*, No. 10-CV-01131-LHK, 2011 WL 1466129, at *6 (N.D. Cal. Apr. 15, 2011); *see Dark v. Curry Cnty.*, 451 F.3d 1078, 1087 (9th Cir. 2006) (interpreting the federal Americans With Disabilities Act).

Calderon's job descriptions state that the PCT position "provides direct patient care that <u>regularly</u> involves heaving lifting and moving of patients, and assisting with ambulation." 4-ER-668 (underlining added). The PCT position also "<u>requires</u> frequent, prolonged periods of standing and the employee <u>must</u> be able to bend over." *Id.* (underlining added). Further, "[t]he employee may occasionally be required to move, with assistance, machines and equipment of up to 200 lbs., and may lift chemical and water solutions of up to 30 lbs. as high as 5 feet." *Id.* (*See also* Appellant's Br. 4.)

**Time Spent Performing Physical Functions and Work Experience of Job Incumbents.** Calderon's own testimony about her personal experience on the job is probative of time she spent performing physically demanding functions. *See Matkovich v. Costco Wholesale Corp.*, No. CV 15-2057 MRW, 2020 WL 2519576,

29

at *6 (C.D. Cal. May 14, 2020). As set forth in the Statement of Facts, *supra*, Calderon testified in her deposition:

- In a 10-hour workday, she spent more than seven of those hours standing. 4-ER-610:4–16.

- Calderon had to assist approximately two patients in and out of wheelchairs each shift, with Akram testifying that the vast majority of such patients weighed in excess of 100 pounds. 4-ER-605:13–606:7, 702:22–703:5.

- Calderon saw approximately nine to twelve patients each day, and each patient's treatment required that she lift a chemical and water solution weighing up to 40 pounds. 4-ER-605:4–6, 609:7–20.

Calderon's own testimony, therefore, is consistent with the written job descriptions' summary of the physical requirements to perform the essential functions of the PCT position.

**Employer's Judgment.** Hayden testified that the "primary responsibilities and core functions" of a PCT involve prolonged bending, walking, and squatting, including "bending at the chair side to make patients comfortable," "picking up trash from the floor to keep a safe and clean environment," "[r]etrieving items around the dialysis station," and "go[ing] to the inventory room and put[ting] away supplies and tak[ing] care of the water room." 4-ER-746:17–747:8. Hayden further

30

testified that stooping, bending, and walking were all "critical components of the PCT role and function." 4-ER-757:25–758:6, 763:1–22.

**Consequences of Not Requiring the Incumbent to Perform the Duties in Question.** As Calderon herself points out in her Opening Brief, there were only five to six PCTs working per shift. (Appellant's Br. 5, citing 3-ER-358:26–27 at ¶ 5.) When Calderon was provided a temporary light duty position, Calderon's co-workers were taking on a lot of additional work to cover the duties that Calderon could not perform, which was hindering the operational needs of the clinic. 4-ER-715:15–21, 744:18–745:11, 756:1–16, 763:1–22. This became an even greater problem when BMA Mission Hills went into mitigation status in 2020, placing a premium on operational efficiency. 4-ER-741:13–20, 775:14–776:4 at ¶¶ 3-6.

Calderon's Opening Brief only glancingly addresses the issue of whether the physical demands of the position were essential to its performance. She argues that because Akram said the percentage of time spent lifting was "very minor – when as needed," lifting was not an essential function. (Appellant's Br. 33, citing to 3-ER-518:5–7.) But, as Calderon herself testified, "very minor" was still nine to twelve patients each day, which required lifting 30-pound bags of solutions nine to twelve times during the shift and lifting patients weighing 100 pounds or more in and out of wheelchairs and the treatment chairs at least one to two times a day. 4-ER-605:4–6, 605:13–606:11 702:22–703:5. A function is not required to be

31

"constant or continuous" (Appellant's Br. 33) to be essential. *Lui v. City & Cnty. of S.F.*, 211 Cal. App. 4th 962, 985 (2012). Even more significantly, Calderon makes no attempt to rebut the evidence as to the frequent bending and stooping, and nearly constant standing, that were part of her role. Hence, that evidence must stand as undisputed.

Based on the foregoing, the district court properly concluded that the physical requirements of lifting heavy amounts, bending and stooping, and prolonged standing were undisputedly required to perform a PCT's essential functions.

### 3. The District Court Properly Ruled that Calderon Could Not Perform the Essential Physical Functions of a PCT

Calderon's most recent doctor's note (first presented to BMA Mission Hills in September 2019) identified significant physical restrictions that precluded her from performing the essential functions of her job. Under that note, Calderon was precluded from (1) lifting/carrying more than 10 pounds, (2) prolonged standing/walking, (3) bending, stooping, or climbing, and (4) kneeling, squatting or crawling. 2-ER-110–111 [ADMF #78]; 3-ER-373, 375, 377.

Comparing these restrictions to the essential functions discussed in the section above undisputedly demonstrates that Calderon could not perform many of the essential functions of her job. For example, a PCT stands in excess of seven

32

hours a day; however, Calderon could not engage in prolonged standing/walking. A PCT is required to lift chemical and water solutions of up to 40 pounds per patient and assist approximately two patients in and out of a wheelchair per shift; yet Calderon could not lift or carry more than 10 pounds. PCTs are required to bend, stoop, and kneel to assist patients, work in and manage the supply and water room, and clean stations; yet Calderon could not bend, stoop, or kneel. *Saracay*, 2019 WL 4194308, at *5 (For a hotel housekeeper, "squatting, kneeling, knee bending, repetitive right-hand motions, and lifting, pushing, and pulling heavy weights were essential functions of Plaintiff's job. These duties were specialized and comprised the majority of Plaintiff's work. The elimination of these duties would eliminate the need for Plaintiff's job.").

This conclusion is further corroborated by Calderon's own testimony. An employee's concession at her deposition that she could not perform the essential functions of her job with her work restrictions forecloses arguments that the employee could have been accommodated in her current position. *Chisolm v. 7-Eleven, Inc.*, 814 Fed.App'x. 194, 197 (9th Cir. 2020); *Ceja-Corona v. CVS Pharmacy, Inc.*, 664 Fed.App'x. 649, 650 (9th Cir. 2016); *Saracay*, 2019 WL 4194308, at *5–6. When all of Calderon's physical restrictions were listed at her deposition and she was asked if she could perform the PCT duties notwithstanding

33

those limitations, Calderon responded with an unequivocal "No." 2-ER-174–178 [UMF #16]; 4-ER-639:24–640:9.

Calderon's argument that her admission should be disregarded is without merit. Calderon contends that the question was "long and confusing." (Appellant's Br. 35.) Yet Calderon's counsel never objected to the question. 4-ER-639–640; Fed. R. Civ. Proc. 32(d)(3)(B) (objections to form of question waived if not timely made during the deposition); *Hanline v. Cnty. of Ventura*, No. CV 15-8808-VAP (AJWx), 2017 WL 11682912, at *3 (C.D. Cal. Aug. 7, 2017) (same). Calderon never testified in her deposition, or even in her self-serving declaration afterwards, that she was confused by the question. *See* 3-ER-358–363. Calderon also insinuates there was a language barrier because her first language is not English. (Appellant's Br. 35.) But Calderon declined a Spanish-language interpreter for her deposition through her counsel, confirmed at her deposition that she was comfortable proceeding in English, drafted her declaration in opposition to summary judgment in English, and never raised this issue in that same declaration. 2-ER-58; 3-ER-358–363, 544:16–18. There is simply no underline evidence (only argument) that Calderon was confused or did not understand the question of whether she could perform the PCT job considering all of her restrictions.

Calderon argues that the failure to raise the issue of her disability during a performance review on March 9, 2020 is somehow evidence that she could

34

perform the essential duties of her position. (Appellant's Br. 31.) This is of no moment. First, the actual performance review itself is not part of the record on appeal and cannot be considered. Second, when Calderon's supervisor Akram was asked if she had discussed "accommodations or anything like that" in the context of this review, Akram merely responded: "No. *Not during performance evaluations.*" 3-ER-523:10–12 (emphasis added). But Akram was equally clear that the subject of accommodations undisputedly and repeatedly came up separate from the performance review. 3-ER-492:3–16, 493:5–19, 494:2–13; 4-ER-705:1–24. Calderon points to no evidence that it was company practice to combine a discussion of the accommodation process with annual performance reviews, or that the performance evaluation even discussed the physical demands of the job.

The district court also properly disregarded Calderon's declaration on this same point. "A conclusory, self-serving affidavit, lacking detailed facts and supporting evidence, is insufficient to create a genuine issue of material fact." *FTC. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *accord Bohmker v. Oregon*, 903 F.3d 1029, 1044 (9th Cir. 2018); *King v. United Parcel Serv., Inc.*, 152 Cal. App. 4th 426, 433 (2007). There must be evidence beyond a "mere assertion." *U.S. v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 639 (9th Cir. 2012).

FP 46113784.1

Here, the district court properly disregarded Calderon's declaration statement: "Although I had restrictions, I was able to perform the PCT job even without accommodations and had been doing so since 2015." 1-ER-19, citing to 3-ER-360:26–27 at ¶ 16. Calderon's conclusory statement was unsupported by any corroborating evidence, and she failed to address factual issues such as: (1) what duties she considered part of the job, (2) what duties she could perform even with her restrictions, and (3) how performing those duties did not violate her restrictions. *Latham v. Cambria Co. LLC*, No. SA CV 16-0561-DOC (PLAx), 2017 WL 125013, at *6 (C.D. Cal. Jan. 12, 2017) (declaration of employee opining that he felt he could perform the essential functions of his position insufficient to meet *prima facie* burden that he could perform the job with or without reasonable accommodation).

Calderon also fails to square her declaration with the job restrictions imposed by her workers' compensation doctor, her own deposition testimony regarding the amount of time she spent performing various duties that involved those restrictions, and her own deposition testimony that she could not perform the PCT role with her restrictions. 3-ER-373, 375, 377; 4-ER-605:4–6, 605:13–606:7, 608:6–11, 608:22–609:4, 609:7–20, 610:4–16, 639:24–640:9, 702:22–703:5.

As such, the district court's rejection of Calderon's self-serving, conclusory and contradictory declaration was not an abuse of discretion. *Wang v. Sony Picture Entm't, Inc.*, 721 Fed.App'x. 634, 636 (9th Cir. 2018).

Calderon's Opening Brief repeatedly asserts that she had been performing the PCT role since 2015 notwithstanding her medical restrictions, and thus those restrictions did not render her unqualified. (Appellant's Br. 6–8, 31–35, 50.) There are several responses to this which dispose of Calderon's contention. First, Calderon's medical restrictions were significantly stricter in 2020, when BMA Mission Hills determined it could no longer accommodate her, than they had been in the past. 3-ER-370, 372–377. Second, Calderon had not, in fact, been performing her role consistent with the medical restrictions, but rather was violating those restrictions without the company's approval, and potentially endangering herself and her critically ill patients. 3-ER-492:10–13, 493:5–19; 4-ER-706:1–4, 707:16–708:4. Third, the fact that for periods of time prior to 2020 BMA Mission Hills had allowed other PCT's to take over some of Calderon's essential functions did not require it to continue to do so, especially in the face of changed business circumstances in 2020. *See Urbina v. Comcast Cable Comm'cns Mgmt., LLC*, 788 Fed.App'x. 522, 523 (9th Cir. 2019) ("FEHA does not require an employer to exempt a disabled employee from any essential function of the job or convert a temporary, light-duty accommodation into a permanent position."); *c.f.*

37

*Matkovich v. Costco Wholesale Corp.*, No. CV 15-2057 MRW, 2020 WL 2519576, at *7 (C.D. Cal. May 14, 2020) (finding defendant not liable for disability discrimination for terminating plaintiff's employment after other employees performed essential functions for plaintiff for two years).

> **4.** **The District Court Properly Ruled That There Were No Available Reasonable Accommodations That Would Have Permitted Calderon to Perform the Essential Functions of a PCT**

As set forth in the Statement of Facts, *supra*, BMA Mission Hills management and human resources were unable to identify a reasonable accommodation that would enable Calderon to perform the essential functions of her PCT role. FEHA "does not prohibit an employer from . . . discharging an employee with a physical or mental disability, or subject an employer to any legal liability resulting from . . . the discharge of an employee with a physical or mental disability, if the employee, because of a physical or mental disability, is unable to perform the employee's essential duties even with reasonable accommodations . . ." CAL. GOV'T CODE § 12940(a)(1) (West 2022); *accord Atkins v. City of L.A.*, 8 Cal. App. 5th 696, 715–20 (2017), as modified on denial of reh'g (Mar. 13, 2017) (overruling verdict in favor of employees upon finding substantial evidence did not support that the employees could perform the job they had with or without reasonable accommodation). "A reasonable accommodation is a modification or

38

adjustment to the work environment that enables the employee to perform the essential functions of the job he or she holds or desires." *Nealy v. City of Santa Monica*, 234 Cal. App. 4th 359, 373 (2015), citing *Nadaf–Rahrov v. Neiman Marcus Group*, *Inc.,* 166 Cal. App. 4th 952, 974 (2008).

Here, as of March 2020, there simply were no reasonable accommodations available at the Mission Hills clinic that would permit Calderon to perform the essential functions of her PCT role. In the challenging business climate in which the company found itself, it could not continue to rely upon the other PCTs to perform some of Calderon's essential duties, along with their own. 2-ER-192–193 [UMF #25]; 4-ER-709:14–710:24, 711:11–23, 716:4–15, 724:25–726:3, 726:16–727:1. That accommodation had been tried before but it was not effective – the patients often required urgent attention, and Calderon could not wait for another PCT to handle matters that were outside her physical restrictions. 2-ER-165–169 [UMF #9]; 4-ER-619:18–621:15, 630:20–631:11, 664–665. This resulted in Calderon becoming impatient and performing tasks that violated her doctor's restrictions, which was not permissible. 2-ER-165–169 [UMF #9]; 4-ER-619:18–621:14, 630:20–631:11, 705:1–706:4, 707:8–708:4, 744:13–21.

Calderon's managers, in consultation with Human Resources and Risk Management, met multiple times to determine whether Calderon could be accommodated in such a fashion that she could perform the essential functions of

39

her job without other PCTs being required to perform those functions for her. Job restructuring is a proper reasonable accommodation only when it involves "reallocation or redistribution of non-essential job functions in a job with multiple responsibilities." CAL. CODE REGS. tit. 2, § 11065(p)(2)(E) (2022). However, "elimination of an essential function is not a reasonable accommodation. . ." *Nealy*, 234 Cal. App. 4th at 375; *accord* CAL. CODE REGS. tit. 2, § 11068(b) (2022); *Urbina*, 788 Fed.App'x. at 523; *Lui*, 211 Cal. App. 4th at 985.

In addition, both Akram and Battles-Singleton reached out to other clinics in the area to determine whether there might be open administrative positions that could accommodate Calderon's work restrictions. 2-ER-193–196 [UMF #26]; 4-ER-704:3–12, 729:16–730:5, 760:18–761:3, 761:12–19. Unfortunately, no such openings were available at that time. 2-ER-193–196 [UMF #26]; 4-ER-766:24–767:11. It was only after BMA Mission Hills engaged in all these efforts that it determined no reasonable accommodation could be made for Calderon. Even then, the company offered Calderon the option of applying for other openings in the future, going on temporary leave, or applying for permanent disability status. 2-ER-196–197, 203–205 [UMF #27, 29]; 4-ER-588:16–589:4, 590:20–591:11, 657, 776:14–20 at ¶ 9, 779.

Calderon's arguments on this point miss the mark, as they either involve proposed accommodations that would not be effective in allowing her to perform

40

her essential duties, or they would involve the elimination of those essential duties. BMA Mission Hills will address each of these arguments in turn:

**Allowing for More Sitting.** Calderon's position required an extensive amount of time standing, which was contrary to her stringent physical restrictions. Calderon argues that the clinic could have provided her with more sit-down tasks from other PCTs and re-assigned Calderon's standing tasks to others. (Appellant's Br. 33, 35.) 3-ER-361:4–6 at ¶ 17. Calderon testified that she spent less than two hours seated in her 9+ hour workday. 4-ER-610:4–16. To provide Calderon a job in which she sat for the majority of the time is to provide a completely different job from that of a PCT. *See* CAL. CODE REGS. tit. 2, § 11065(e)(2)(C) (2022) (evidence of whether something is an essential job function includes "[t]he amount of time spent on the job performing the function."). Moreover, there were only five to six other PCTs working to whom additional standing time could be redistributed. 3-ER-358:26–27 at ¶ 5. Under such circumstances, such a reallocation was not reasonable and would not have permitted Calderon to perform her essential functions.

**Use of Scooter.** Calderon also argues that she could have been permitted to use a scooter. (Appellant's Br. 33, 35.) But this argument fails to address how her use of a scooter would enable her to perform the physical job functions set forth in the PCT job description (which included prolonged standing). *See* 4-ER-660–662,

41

667–668. In her testimony, even Calderon seemed unconvinced of this option's feasibility, stating only that it "maybe" would have worked and "maybe it would have been impractical." 3-ER-361:15–17 at ¶ 19. This falls short of Calderon meeting her *prima facie* burden of demonstrating that she was a qualified individual who could perform her role with reasonable accommodation. *Nealy*, 234 Cal. App. 4th at 378.

**Provision of a Stool.** Calderon argues for the first time on appeal that she could have been accommodated with a stool because she had been provided that accommodation in the past. (Appellant's Br. 33, 35.) By not raising this argument in the district court, Calderon has waived such argument here. *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992) ("As a general rule, an appellate court will not hear an issue raised for the first time on appeal."); *In re E.R. Fegert, Inc.*, 887 F.2d 955, 957 (9th Cir. 1989) (While "[t]here is no bright-line rule to determine whether a matter has been properly raised . . . the argument must be raised sufficiently for the trial court to rule on it."). Even if Calderon had sufficiently raised the stool accommodation in the court below, Akram testified that the use of a stool left Calderon unable to perform essential functions such as cleaning, lifting patient's legs, changing bags, or carrying. 4-ER-705:4–21; *see* 4-ER-757:25–758:6. As such, it was not a *reasonable* accommodation because

42

Calderon still could not perform the essential functions of a PCT even if she had a stool.

**Continued Assistance By Other PCTs.** A common theme throughout Calderon's brief is that BMA Mission Hills' temporary accommodation of her physical restrictions by having the other PCTs cover them (along with their other duties) should have continued. (Appellant's Br. 34–37.) But FEHA does not require an employer to convert a temporary light-duty position into a permanent position. For example, in *Raine v. City of Burbank*, 135 Cal. App. 4th 1215 (2006), the California Court of Appeal held that an employer did not need to convert a temporary light-duty assignment the employee held for six years while attempting to recover from his injuries into a permanent accommodation. *Id.* at 1223–24; *accord Watkins v. Ameripride Servs.*, 375 F.3d 821, 828 (9th Cir. 2004).

Here, although Calderon had been accommodated at points in the past by having her coworkers perform some of her essential patient care duties (3-ER-492:3–13, 493:5–13, 494:14–25; 4-ER-619:18–620:18, 745:1–11), BMA Mission Hills had no obligation to continue to provide such light duty work to Calderon indefinitely. CAL. CODE REGS. tit. 2, § 11068(d)(3)–(4) (2022). This was especially true in light of the changing business conditions and challenging circumstances confronted by the company in the spring of 2020.

43

**Calderon's Case Authorities**. Neither of the cases cited by Calderon regarding reasonable accommodations detract from the conclusions reached above. (Appellant's Br. 34–35.) In *Sargent v. Litton Systems, Inc.*, 841 F.Supp. 959 (N.D. Cal. 1994), the issue was whether an employer had a duty to explore accommodations with an employee whose physical disability made commuting to work difficult. These potential accommodations included a leave of absence, notifying the employee of its practice of working with employees to set up carpools, or restructuring the position to make it work-from-home. *Id.* at 960–962. None of these accommodations, unlike here, removed an essential function.

Similarly, the case of *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220 (11th Cir. 2005) is inapposite. There, the Eleventh Circuit addressed the issue of accommodating a disabled employee by having other employees trained to perform a single, non-essential duty. In *D'Angelo*, the employee, a product transporter, was asked—for the first time after a year-and-a-half in the position—to monitor a conveyor belt, which triggered her vertigo. *Id.* at 1223. The Eleventh Circuit held that working on the conveyor belt was not an essential function of the position, noting that supervisors testified that the employee was not required to work on the conveyer belt, the job description did not mention working on the conveyer belt, and the amount of time spent working on the conveyer belt (one time in one-and-a-half years) weighed against finding it was an essential function. *Id.* at 1230.

44

In contrast, BMA Mission Hills is not arguing that it wants the flexibility for Calderon to perform a task that PCTs otherwise generally do not perform. Rather, Calderon cannot perform essential, fundamental tasks that she would need to perform on a daily basis, repeatedly and some for the majority of the day. She is very differently positioned than the employees in *D'Angelo* and *Sargent*.

For all of the foregoing reasons, Calderon cannot raise a genuine dispute that she was a qualified individual as required for the second element of her *prima facie* case of disability discrimination. *Prue*, 242 Cal. App. 4th at 1378. The district court therefore properly granted summary judgment on this claim.

## IV. THE DISTRICT COURT PROPERLY RULED THAT CALDERON'S SECOND CAUSE OF ACTION FOR FAILURE TO ACCOMODATE FAILED AS A MATTER OF LAW

An employer must provide a reasonable accommodation to an employee with a known mental or physical disability unless the accommodation would cause undue hardship. CAL. GOV'T CODE § 12940(m) (West 2022). To establish a failure to accommodate, an employee must show: (1) she suffered from a disability covered by FEHA, (2) she could perform the essential functions of the position with reasonable accommodation, and (3) the employer failed to reasonably accommodate her disability. *Nealy*, 234 Cal. App. 4th at 373; *Wilson v. Cnty. of Orange*, 169 Cal. App. 4th 1185, 1192 (2009).

45

The legal standard for a stand-alone reasonable accommodation claim is quite similar to that for a disability discrimination claim. Therefore, the discussion in Section III, *supra*, applies equally to Calderon's reasonable accommodation claim, and is incorporated by reference. The one key difference is that for purposes of a stand-alone failure to accommodate claim, a reasonable accommodation can also include reassignment to a vacant position where the employee can perform the essential functions. CAL. CODE REGS. tit. 2, § 11068(d) (2022); *Atkins*, 8 Cal. App. 5th at 717; *Furtado v. State Pers. Bd.*, 212 Cal. App. 4th 729, 755 (2013). Therefore, that factor is separately addressed in this section.

"[A]n employer can prevail on summary judgment on a claim of failure to reasonably accommodate by establishing through undisputed facts that there simply was no vacant position within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation." *Nealy*, 234 Cal. App. 4th at 378 (internal quotation marks omitted); *accord Swanson v. Morengo Unified Sch. Dist.*, 232 Cal. App. 4th 954, 971 (2014).

Here, both Akram and Battles-Singleton investigated whether other clinics had open positions that could accommodate Calderon's restrictions, but they were unable to find any suitable vacant positions. 4-ER-704:3–12, 729:24–730:5, 767:6–11, 783:1-5 at ¶ 7. Calderon claims that Akram could not provide any specifics or

46

provide documentation. (Appellant's Br. 41.) However, Calderon's counsel never asked for further specifics or documentation in the deposition, or at any other point in discovery. 4-ER-704:3–12. Akram's testimony on this point stands unrebutted by Calderon.

Because Appellees presented evidence that there were no suitable open positions available in February-March 2020, the burden shifts to the employee to raise a genuine dispute that a position for which she was qualified was available. *Chilsom*, 814 Fed.App'x. at 196–97; *Ceja-Corona*, 664 Fed.App'x. at 650. Calderon testified that "Fresenius has many clinics where I could have worked in an open position or under accommodation," but she does not identify a single such clinic or an actual open position. 3-ER-361:18–20 at ¶ 20. Calderon's speculation, absent evidence that a vacant position was available, does not create a genuine dispute. *Engel v. Time Warner Cable*, No. EDCV 19-074 PSG (KKx), 2020 WL 2114933, at *9 (C.D. Cal. Jan. 30, 2020).

By Calderon's own admission, despite being asked to tell BMA Mission Hills in the March 18, 2020 letter which of the three options she wanted to select, she never responded. 2-ER-208–215 [UMF #31-33]; 4-ER-600:21–23, 601:4–7, 642:23–643:4. In fact, Calderon testified in her deposition that she purposely never applied for a leave of absence "[b]ecause I wasn't asking for that." 4-ER-600:21–25. But under the law of reasonable accommodation, an employee is not entitled to

47

the accommodation of their choice, but rather only an accommodation that is reasonable. *Raine*, 135 Cal. App. 4th at 1222; *Grantz v. State Farm Mut. Auto. Ins. Co.*, 420 Fed.App'x. 692, 694 (9th Cir. 2011). Calderon could have selected the leave option, which would have given her time, while still on the company roster, to explore other potential suitable vacancies if they arose. But, as discussed in the next section on interactive process, Calderon essentially shut down all contact with BMA Mission Hills after being provided the options set forth in the March 18, 2020, letter.

With respect to the company's offer of permanent disability, Calderon argues that she did not take it seriously because BMA Mission Hills and FMS "made no effort to make that an actual option for her." (Appellant's Br. 17.) Calderon cites no evidentiary support for this assertion, and she fails to explain how this was so given that Calderon was provided a letter with contact information if she had questions about any of the options presented in the letter. 4-ER-657. Calderon's argument that permanent disability was effectively illusory because Battles-Singleton did not know how the third-party program was administered is likewise unavailing. Had Calderon selected that option, she would have been put in contact with the third-party administrator, as the option of permanent disability was related to her workers' compensation claim. 3-ER-398:21–399:3, 399:11–23.

48

For the foregoing reasons as well as the reasons discussed in Section III, *supra*, Calderon cannot raise a genuine dispute as to her stand-alone claim for failure to reasonably accommodate. *Nealy*, 234 Cal. App. 4th at 373. The district court properly granted summary judgment on this claim as well.

## V. THE DISTRICT COURT PROPERLY RULED THAT CALDERON'S THIRD CAUSE OF ACTION FOR FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS FAILED AS A MATTER OF LAW

To establish a failure to engage in the interactive process, an employee must establish: (1) they suffered from a covered disability, (2) the disability was reasonably known to the employer, (3) the employee was willing to participate in an interactive process to determine whether reasonable accommodation could be made to allow the performance of essential duties, and (4) the employer failed to do so. *Scotch v. Art Inst. of Cal.*, 173 Cal. App. 4th 986, 1003 (2009).

While employees may have access to less information than employers about vacant positions during the interactive process, "litigation allows an employee to correct that imbalance through discovery." *Ceja-Corona*, 664 Fed.App'x. at 651; *Scotch*, 173 Cal. App. 4th at 1018; *Nealy*, 234 Cal. App. 4th at 379. Therefore, at the summary judgment stage, to prevail on a claim for failure to engage in the interactive process, "the employee <u>must</u> identify a reasonable accommodation that would have been available at the time the interactive process occurred." *Nealy*, 234

49

Cal. App. 4th at 378 (underlining added); *accord Elzeftawy v. Michael Baker Int'l, Inc.*, 854 Fed.App'x. 931, 932–33 (9th Cir. 2021); *Alamillo v. BNSF Railway Co.*, 869 F.3d 916, 922 (9th Cir. 2017); *Nadaf-Rahrov*, 166 Cal. App. 4th at 980–81; *see also Jensen v. Wells Fargo Bank*, 85 Cal. App. 4th 245, 263 (2000) (employer can prevail on summary judgment if it establishes through undisputed facts that "there simply was no vacant position within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without reasonable accommodation").

In her Opening Brief, Calderon repeats many of the same arguments about possible accommodations that have already been addressed in Section III, *supra*. She also sets forth a laundry list of petty criticisms on the number of meetings the company had with her, or whether other aspects of the interactive process were to her liking. (Appellant's Br. 47–48.) None of these petty criticisms are of any moment. Tellingly, she does not tie such criticisms to an explanation of how any further processes would have resulted in the availability of a reasonable accommodation. (Appellant's Br. 47–48.) As one California court explained:

> Permitting a FEHA cause of action [for failure to engage in the interactive process when there is no reasonable accommodation] would allow recovery for harm resulting solely from an employee's *perception* that she

50

> was not permitted a fair chance to perform her job—as
> opposed to her actually having been denied such a fair
> chance.

*Shirvanyan v. Los Angeles Community College Dist.*, 59 Cal. App. 5th 82, 97 (2020) (emphasis in original).

As discussed above, Calderon has been unable to identify a reasonable accommodation that was available when she was working at the Mission Hills clinic and that would have enabled her to perform the essential functions of her job. Such a failure is alone fatal to her claim. *Scotch*, 173 Cal. App. 4th at 1019 (affirming grant of summary judgment in employer's favor on failure to engage in the interactive process claim because of the employee's failure to identify a reasonable accommodation available during the time of the interactive process); *Nealy*, 234 Cal. App. 4th at 379–80 (same); *Urbina*, 788 Fed.App'x. at 523 (same); *Ceja-Corona*, 664 Fed.App'x. at 651 (same).

Wholly apart from the foregoing point, the interactive process is a two-way street. As Calderon's Opening Brief points out, "A party that fails to communicate, by way of initiation or response, may also be acting in bad faith." (Appellant's Br. 46, quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) (erroneously attributed by Calderon as being directly quoted in *Jensen*, 85 Cal. App. 4th at 263).) Here, Calderon essentially shut down once she received the

51

March 2020 letter, and never once communicated with BMA Mission Hills or responded to other attempts to reach her with regard to the three options in the letter, or later, with regard to administrative positions for which she might qualify. 2-ER-208–215, 220 [UMF #31–33, 41]; 4-ER-586:7–9, 587:4–8, 600:21–23, 601:4–7, 642:23–643:4. For this reason, too, Calderon's claim for failure to engage in the interactive process fails.

## VI.  THE DISTRICT COURT PROPERLY RULED THAT CALDERON'S FOURTH CAUSE OF ACTION FOR RETALIATION FAILED AS A MATTER OF LAW

California courts use the same *McDonnell Douglas* burden-shifting test for retaliation claims under FEHA as they do for discrimination claims. *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 67–68 (2000). Under that test, the employee must first establish a *prima facie* case of retaliation. *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005). Once an employee establishes a *prima facie* case, the employer is required to proffer a legitimate, non-retaliatory reason for the adverse employment action. *Id.* If the employer produces that legitimate reason, "the presumption of retaliation 'drops out of the picture,' and the burden shifts back to the employee to prove intentional retaliation." *Id.*[6]

---

[6] The district court found that Calderon had adduced enough evidence to make out a prima facie case of retaliation in light of the low evidentiary bar, and due to what the court viewed as the temporal proximity between Calderon's request for

The district court correctly concluded that BMA Mission Hills met its burden of articulating a legitimate, non-retaliatory reason for its decision that Calderon could not be reasonably accommodated. Calderon could no longer be reasonably accommodated at the Mission Hills clinic because she was unable to perform the essential functions of her job, and accommodating Calderon was hindering the operational needs of the clinic. 2-ER-192–193 [UMF #25]; 4-ER-709:14–710:24, 711:11–23, 716:4–15, 724:25–726:3, 726:16–727:1. Calderon's physical restrictions prevented her from performing her primary PCT duties and her co-workers had to take on a lot of additional work to cover the duties that Calderon could not perform. 4-ER-715:15–21, 744:18–745:11. While the company had in the past temporarily allowed some of Calderon's essential duties to be covered by her co-workers, it was not required to continue to do so, and, especially in view of the operational issues occurring in 2020, determined that it simply could not continue her on what amounted to light duty. *Urbina*, 788 Fed.App'x. at 523. FEHA does not consider it a reasonable accommodation to require an employer to

---

accommodations and the adverse action. 1-ER-23–24. While BMA Mission Hills does not agree with the district court's conclusion, especially in light of the numerous accommodations the company had provided to Calderon over the years, this response will be focused upon the next stage inquiry as to the legitimate, non-retaliatory reasons for the adverse action given that many of the same facts apply to both inquiries anyway.

53

convert a temporary light duty position into a permanent position. CAL. CODE REGS. tit. 2, § 11068(d)(3)–(4) (2022); *Raine*, 135 Cal. App. 4th at 1223–24.

Furthermore, Akram and Battles-Singleton canvassed other clinics in the area, but they were unable to identify any open positions that would accommodate Calderon's restrictions. 2-ER-193–196 [UMF #26]; 4-ER-704:3–12, 729:16–730:5, 760:18–761:3, 761:12–19, 766:24–767:11, 771. And, even then, BMA Mission Hills did not terminate Calderon's employment, but instead allowed her the option of applying for open positions that were consistent with her restrictions, to go on a leave of absence that would enable her to continue to look for suitable positions while she remained in the company's employ, or to apply for permanent disability. 2-ER-196–197 [UMF #27]; 4-ER-588:16–589:4, 590:20–591:11, 657. And, even though Calderon never responded to such options, BMA Mission Hills later brought to her attention potential administrative positions for which she might have qualified even with her medical restrictions. 2-ER-228–236 [UMF #43]; 4-ER-783:12–17 at ¶ 10, 786.

In sum, as the district court concluded, there can be no question that BMA Mission Hills has met its burden of providing a legitimate, non-retaliatory reason for the adverse employment action as to Calderon.

Calderon's scattershot attempts to establish pretext were correctly rejected by the district court. It is not enough for Calderon to show her employer's decision

54

was "wrong, mistaken, or unwise." *Lucent Techs. Inc.*, 642 F.3d at 746; *accord Hersant v. Dep't of Soc. Servs.*, 57 Cal. App. 4th 997, 1005 (1997). Rather, an employee must produce "substantial, responsive evidence" that "demonstrate[s] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence...and hence infer that the employer did not act for the...non-discriminatory reasons." *Lucent Techs Inc.*, 642 F.3d at 746. Here, Calderon falls far short of producing "both *specific and substantial*" evidence to overcome the legitimate reasons put forward by BMA Mission Hills. *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 659 (9th Cir. 2002) (italics in original).

Calderon's attempts to establish pretext must be viewed against the backdrop of her deposition testimony as to BMA Mission Hills' motives. She admitted that she had no reason to think that her employer was trying to get rid of her. 2-ER-236–245 [UMF #45]; 4-ER-644:8–13. She further admitted that she never heard any supervisors or manager make statements that indicated bias against individuals with disabilities and, when that statement was placed as an uncontroverted fact in the motion for summary judgment, Calderon did not dispute it. 2-ER-247 [UMF #50]; 4-ER-580:24–581:3. Although Calderon attempted to walk back these admissions in her subsequent declaration, the district court

55

properly disregarded such attempt to avoid the implications of her prior deposition admissions. 1-ER-24–29.

**100% Healed Policy.** FEHA requires that, for purposes of a reasonable accommodation, an employer:

> [A]ssess individually an employee's ability to perform the essential functions of the employee's job either with or without reasonable accommodation. In the absence of an individualized assessment, an employer or other covered entity shall not impose a "100 percent healed" or "fully healed" policy before the employee can return to work after an illness or injury.

Cal. Code Regs. tit. 2, § 11068(i) (2022).

Consistent with the above, BMA Mission Hills performed just such an individualized assessment. Hayden, Akram, Battles-Singleton, and Lillibridge had three to four conversations discussing possible accommodations for Calderon. 4-ER-753:7–755:20, 764:16–765:3. As part of this process, they discussed the essential functions of the PCT position, which of those functions Calderon could (or could not) perform, and considered what further accommodations could potentially be provided in addition to those already made available to Calderon. 4-ER-757:20–758:6, 759:10–18.

56

The fact that Akram explained to Calderon that they needed PCTs who can perform the full scope of their essential duties does not negate that Calderon was provided an individualized assessment. 3-ER-508:18–25. As Akram had explained, "[t]here were not going to be any special projects in the facility in Mission Hills, therefore, she could not be accommodated in that role with her current restrictions." 3-ER-508:18–25. In other words, there were no special projects for which her physical restrictions would be a fit. Requiring a PCT to be able to perform all the essential duties (with or without a reasonable accommodation, if any) is not the same as requiring the PCT to be "fully healed." The issue here was Calderon's inability to perform the critical, safety sensitive essential duties of her job, not whether she was fully recovered. Akram's testimony is in fact consistent with the legitimate, non-retaliatory reasons provided.

The situation here is analogous to that in *Lucent Technologies*. One of Lucent Technologies' employees (a nurse) told the terminated employee's wife that he "must be one-hundred percent to return to gainful employment" and Lucent Technologies had a policy providing disabled employees with an additional 6 months of unpaid leave only if their "prognosis for full recovery is within six months of the expiration of [their] sickness disability benefits." *Lucent Techs., Inc.*, 642 F.3d at 747. The Ninth Circuit held this "[did] not establish pretext because here the undisputed facts demonstrate that Lucent attempted to accommodate [the

57

terminated employee] by continually assessing him on an individual basis." *Id.* Here, too, BMA Mission Hills assessed Calderon on an individual basis, and even after March 2020, was open to her placement in alternative positions regardless of the status of her physical healing. 2-ER-193–197, 203–205, 228–236 [UMF #26, 27, 29, 43]; 4-ER-588:16–589:4, 590:20–591:11, 657, 704:3–12, 729:16–730:5, 760:18–761:3, 761:12–19, 766:24–767:11, 771, 776:14–20 at ¶ 9, 779, 783:12–17 at ¶ 10, 786.

**Hayden's E-Mail.** Calderon places great emphasis, out of context, on an e-mail written by Hayden after his meeting with Calderon, treating it as if it were some type of smoking gun. This is patently false, and does not show pretext. On February 18, 2020, Hayden e-mailed human resource employee Theresa Hogan Woodman regarding Calderon: "Theresa please see attached and below. [¶] My hope is we can make the case that the business can no longer support these accommodations yet would appreciate your guidance on how to proceed." 3-ER-533. The e-mail notes an attachment titled "Dolores Calderon 092619 Work Status Report.pdf" and it forwards an e-mail from Akram which states, in relevant part, "As discussed please see attached documents for workers' comp. accommodations being made in the clinic at this time." 3-ER-533.

Calderon's description of this e-mail chain ignores the context of that e-mail. First, Hayden was not issuing a command, but was asking for Human Resources

58

guidance on how to proceed in light of Calderon's restrictions. Second, Hayden had met with Calderon, had access to her medical restrictions, and had been informed of the past accommodations that had involved other PCTs performing some of Calderon's essential duties for her in light of her stringent medical restrictions. Therefore, by "these accommodations" Hayden meant the *unreasonable* accommodations made at points in the past whereby other PCTs were taking over Calderon's essential duties. Given the company's mitigation status and operational challenges, Hayden was looking for guidance on whether such unreasonable accommodations were still required.

**Termination of Another PCT's Employment.** Calderon obliquely references the termination of another employee with restrictions, Celia Enriquez, as purported evidence of pretext. (Appellant's Br. 9, 37.) As the district court correctly noted, this "me too" evidence was insufficient to demonstrate pretext. 1-ER-28. Calderon presented no evidence of Enriquez's restrictions, that her restrictions were similar to Calderon's, or that Enriquez was able to perform the essential job functions with or without accommodation. *Perez v. Alameda Cnty. Sheriff's Off.*, 678 Fed.App'x. 621, 622 (9th Cir. 2017) (district court did not err in granting summary judgment because other employees who presented "me too" declarations were not sufficiently similarly situated).

59

Nor is the fact that Mission Hills hired five to six new PCTs inconsistent with Mission Hills being unable to continue to accommodate Calderon's work restrictions. (*See* Appellant's Br. 39.) Rather, this is fully consistent with Akram's explanation that the clinic was in need of employees who could perform the full range of essential PCT duties. (*Id.*).

**BMA Mission Hills Did Not Disregard Its Own Policies.** An employer's failure to follow its own policies or procedures "may" provide evidence of pretext. *Moore v. Regents of Univ. of Cal.*, 248 Cal. App. 4th 216, 239 (2016); *Zimerman v. Bodycote Thermal Processing Inc.*, No. 2:20-cv-07229-SB-MAA, 2021 WL 3932289, at *5 (C.D. Cal. June 14, 2021). Here, as shown below, there were no departures from existing policy when the facts specific to Calderon's circumstances are taken into account.

First, Calderon argues that, under the company's normal reasonable accommodation process, an employee would receive a questionnaire with a job description to be provided to the doctor to fill out. (Appellant's Br. 44.) However, as the district court observed, the testimony in question concerned "the normal ADA process" and not the process that would apply to Calderon's situation. As the district court pointed out, the Mission Hills clinic was already aware of Calderon's restrictions – Akram had asked for and Calderon had provided her with a doctor's note with the restrictions. 3-ER-488:16–489:10. The point of the questionnaire was

60

so that the clinical manager and human resources could evaluate whether the employee could be reasonably accommodated. 3-ER-405:13–406:1. Here, the doctor's note with Calderon's restrictions was used for that reasonable accommodation evaluation, and Calderon fails to explain what additional information the Mission Hills clinic needed that was not already in the doctor's note.[7] *Perez*, 678 Fed.App'x. at 622 (employee must demonstrate logical nexus between the adverse action and the alleged violation of policy). As such, this falls far short of the "specific and substantial" standard and fails to demonstrate that Calderon could have been accommodated, but for the failure to provide the questionnaire.

Second, Calderon argues that it was normal procedure to provide a "job offer" when a reasonable accommodation is requested by an employee. (Appellant's Br. 9, 44.) However, the testimony cited by Calderon for that proposition fails to state whether a job offer is a normal policy or procedure; it just explains what one is. 3-ER-408:11–13. Whether or not Calderon was given a written "job offer" is beside the point when Calderon fails to point to any evidence

---

[7] If Calderon is trying to insinuate that there was additional information that she had not provided with her doctor's note, then any breakdown of the interactive process rests with her because FEHA requires that an "employee . . . shall exchange essential information identified below [i.e., including necessary medical information] without delay or obstruction of the process." CAL. CODE REGS. tit. 2, § 11069(a) (2022).

61

that there was a policy or procedure that required that she be given one in the first place. *See* 3-ER-408:22–409:4, 499:3–6. Calderon thus falls short of demonstrating that any such policy or procedure existed, let alone that it was violated.

Third, Calderon argues that, according to policy, employees get a "Notice of Offer of Modified or Alternative Work" after the reasonable accommodation process is complete. (Appellant's Br. 44.)[8] Battles-Singleton testified that per company procedure, after the accommodation process had been worked through, "the managers are coached on how to present it, and they communicate directly with the employee of whether or not accommodation can be accommodated" and an "employee <u>may</u> be provided a memo." 3-ER-406:3–11 (underlining added). Here, Akram and Hayden communicated directly with Calderon regarding whether an accommodation could be provided and, at Calderon's request, provided the optional written memo. 3-ER-452:23–454:9, 455:10–456:18, 502:24–503:5, 508:18–25; 4-ER-588:16–589:4, 590:20–591:11, 657. BMA Mission Hills' actions were completely consistent with company policy.

---

[8] Calderon cites testimony of Battles-Singleton referring to a document labeled "Exhibit 9" in the deposition transcript but which is not attached as evidence. As such, it is not clear if it is in fact a document titled "Notice of Offer of Modified or Alternative Work." 3-ER-413:22–414:23. Based on Battles-Singleton's deposition testimony, the document appears to be from 2015, and may not have been a company document, but rather something from the workers' compensation carrier. 3-ER-414:24–415:3, 415:4–13. None of this establishes a company policy that existed in 2015 (when the document appears to be from), let alone 2019 or 2020, or that any such policy was violated.

Finally, Calderon argues that BMA Mission Hills failed to involve Sedgwick, a third-party leave management company. (Appellant's Br. 12.) But there was no need to involve Sedgwick here in the first instance. Calderon wanted an accommodation that was not leave. Moreover, Sedgwick determines whether an employee is eligible for FMLA or medical leave – but, here, regardless of eligibility, a leave of absence was one of the options offered to Calderon. 3-ER-402:3–24, 452:23–454:9, 455:10–456:18, 502:24–503:5, 508:18–25. Moreover, the employee normally opens a case with Sedgwick, absent an emergency situation where the employee is unable to open their own case. 3-ER-465:22–466:3. Here, Akram advised Calderon to open a case with Sedgwick several times, but Calderon failed to do so. 3-ER-466:13–24, 505:7–20, 510:14–21.

In sum, Calderon's shotgun approach to establishing pretext fails miserably, and there is no genuine issue of fact that BMA Mission Hills did not retaliate against Calderon for requesting accommodations.

## VII. THE DISTRICT COURT PROPERLY RULED THAT CALDERON'S FIFTH CAUSE OF ACTION FOR WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY FAILED AS A MATTER OF LAW

To establish a wrongful termination in violation of public policy claim, an employee must show their employment was terminated in violation of a fundamental public policy expressed in a statutory or constitutional provision.

63

*Holmes v. Gen. Dynamics Corp.*, 17 Cal. App. 4th 1418, 1426 (1993). When the underlying statutory claims fail, this derivative wrongful termination claim also fails. *Shoemaker v. Myers*, 52 Cal. 3d 1, 24 (1990); *Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th 215, 229 (1999); *Sneddon v. ABF Freight Cysts.*, 489 F.Supp. 2d 1124, 1131 (S.D. Cal. Aug. 26, 2007). For the same reasons her FEHA claims fail, this derivative claim also fails.

## CONCLUSION

For the foregoing reasons, the district court's well-reasoned order granting summary judgment should be affirmed.

## STATEMENT OF RELATED CASES

Appellees and their counsel are unaware of any related cases.

/s/     *Amy L. Lessa*
Joel W. Rice
Amy L. Lessa
Darcey M. Groden
Attorneys for Defendants-Appellees
Bio-Medical Applications of Mission Hills,
Inc. and Fresenius Management Services,
Inc.

64

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 22-55305

I am the attorney or self-represented party.

**This brief contains** 13,971 **words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s Amy L. Lessa  **Date** January 17, 2023

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**  PAGE 65  *Rev. 12/01/22*

## CERTIFICATE OF SERVICE CM/ECF

## U.S. COURT OF APPEALS DOCKET NUMBER: 22-55305

I hereby certify under penalty of perjury that on January 17, 2023, I electronically filed the foregoing document entitled **APPELLEES' ANSWERING BRIEF** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the APPELLATE Court's CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the NINTH CIRCUIT'S CM/ECF system.

/s/ *Amy L. Lessa*
Amy L. Lessa